## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISRICT OF MISSISSIPPI

| | | |
|---|---|---|
| In re: | ) | Case No. 20-11968-SDM |
| | ) | |
| Minga Investments, LLC, | ) | Chapter: 11 |
| | ) | |
| | ) | Judge: Hon. Selene D. Maddox |
| Debtors.[1] | ) | |
| | ) | |

## MOTION OF ROCHE DIAGNOSTICS CORP. AND ROCHE DIABETES CARE, INC. FOR ENTRY OF AN ORDER MODIFYING AUTOMATIC STAY PURSUANT TO SECTION 362(d)(1) OF THE BANKRUPTCY CODE

Roche Diagnostics Corp. and Roche Diabetes Care, Inc. (collectively, "Roche"), by their undersigned counsel, respectfully submit this motion ("Motion") for entry of an order pursuant to Section 362(d)(1) of Title 11 of the United States Code ("Bankruptcy Code"), modifying the automatic stay to permit Roche to continue a civil action (the "Alabama Action") pending in the United States District Court for the Northern District of Alabama ("District Court"). Roche respectfully requests this relief with respect to both (a) Phillip A. Minga and Konie D. Minga (together, the "Mingas") and three of the other Debtors (collectively, with the Mingas, the "Defaulted Debtors"), against whom the District Court has entered case-ending

---

[1] Debtors Phillip and Konie Minga (Case No. 20-11955-SDM) own or control 13 different corporate entities whose voluntary petitions were filed in this Court at the same time as the Mingas' (collectively, with the Mingas, the "Debtors"). A complete list of the Debtors and their case numbers is attached to this Motion as Exhibit A. In a typical commercial Chapter 11 case, the corporate Debtors would have moved for joint administration of their cases for procedural purposes as part of a suite of first-day motions. As of the filing of this Motion, however, none of the Debtors has sought that relief. Accordingly, Roche is filing the instant Motion in each of the Debtors' cases. Roche reserves all rights with respect to any subsequent motion for joint administration, including the right to argue that the Mingas' Chapter 11 cases should not be jointly administered with the Chapter 11 cases of the other Debtors.

In addition to the fourteen Chapter 11 cases that the Debtors commenced on June 2, 2020 (the "Petition Date"), 19 other entities that are affiliated with the Debtors and are also defendants in the Alabama Action (collectively, the "Chapter 7 Debtors") filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code just three days after the Petition Date. Roche reserves all rights to seek any appropriate relief with respect to the Chapter 7 Debtors, but this Motion seeks none. This request to modify the automatic stay is limited to the Debtors that filed Chapter 11 petitions on the Petition Date.

sanctions, and (b) all of the other Debtors.  In support of the Motion, Roche respectfully states as follows:

## PRELIMINARY STATEMENT

1.       This is not an ordinary Chapter 11 case and these are not ordinary debtors. The Debtors are two individuals, Philip and Konie Minga, and a network of Mississippi and Alabama pharmacies known as "Priority Care" that they operated and managed.  Priority Care was not a legitimate pharmacy business, but rather a massive insurance fraud scheme that caused Roche nearly $50 million in out-of-pocket loss between 2013 and 2018.

2.       In September 2018, Roche filed the Alabama Action against the Debtors and an array of other defendants in the District Court, alleging claims for fraud and violations of the Racketeering Influenced and Corrupt Organizations Act (RICO) based on the Debtors' elaborate insurance fraud scheme.  For the past two years, the parties have been actively engaged in discovery in the Alabama Action, with the Debtors represented by a series of eminent counsel from Mississippi, Alabama, and New York.

3.       Last month, on May 8, 2020, Judge Karon O. Bowdre of the Northern District of Alabama entered default judgment against the Defaulted Debtors on all Roche's claims.[2]  The basis for Judge Bowdre's default judgment, which was issued over the vigorous opposition of the defendants, was a finding by "clear and convincing evidence" that the Defaulted Debtors had engaged in "egregious" bad-faith litigation misconduct.[3]  In particular, Judge Bowdre found that "Roche has clearly and convincingly established that Defendants doctored hundreds of critical discovery documents" in an effort to conceal the extent of their

---

[2] Order, *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 18-cv-1479-KOB-HNJ (N.D. Ala. May 8, 2020), ECF No. 424.  A copy of this Order is attached to this Motion as <u>Exhibit B</u>.  Unless otherwise specified, ECF citations contained in this Motion in the form "Dkt. No. __" refer to docket entries in this civil action pending before the District Court.
[3] *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 2:18-CV-01479-KOB-HNJ, 2020 WL 2308319, at *5, *9 (N.D. Ala. May 8, 2020).  A copy of this decision is attached to this Motion as <u>Exhibit C</u>.

insurance fraud from Roche and the Court.[4] Judge Bowdre further noted that there was

"substantial evidence demonstrating 'Defendants' recalcitrance' and 'pattern of chronic,

deceptive conduct' before the court" and "observe[d] that Defendants' digital manipulation of

evidence is only one activity in an unfortunately lengthy line of abuses before the court."[5]

4.     Upon entering default judgment on May 8, 2020, Judge Bowdre ordered

Roche to submit evidence of its damages by May 26, 2020, ordered the Defaulted Debtors to

respond by June 4, 2020, and set a hearing for June 16.[6] Pursuant to the order, Roche submitted

detailed documentation of its damages on May 26, demonstrating that Roche had suffered nearly

$50 million in damages, which under RICO is due to be trebled to approximately $150 million.

One week later, the Debtors filed their bankruptcy petitions.[7]

5.     Accordingly, the Debtors did not file their bankruptcy petitions to

reorganize their businesses, preserve stakeholder value, or conserve jobs.  They did so to delay

the Alabama Action and prevent Roche from obtaining a final money judgment against the

Defaulted Debtors.

6.     The Alabama Action is all but complete as to the Defaulted Debtors:  the

District Court has received all of the briefing and other submissions it needs to decide the precise

amount of the money judgment it will issue in Roche's favor.  The claims against the other

Debtors are also at an advanced stage:  discovery is complete or nearly complete, and Judge

Bowdre has supervised the Alabama Action for nearly two years, becoming intimately familiar

with the nature and extent of the Debtors' fraud in the process.  Moreover, given the tangled

corporate relationships between and among the Debtors (many of which are owned by one or

---

[4] *Id.* at *9.
[5] *Id.* at *7 n.5
[6] Exhibit B.
[7] Yet, notwithstanding the automatic stay of the Alabama Action, the Defaulted Debtors continued to litigate in the District Court after the Petition Date.  *See* ¶ 22, *infra*.

3

more of the Defaulted Debtors, and all of which are controlled by the Mingas), it would be far

more efficient for the Debtors to defend all of the claims together in the District Court.

Accordingly, Roche files this Motion to request a limited modification of the automatic stay

pursuant to Section 362(d) of the Bankruptcy Code to permit Roche to continue the Alabama

Action against both the Defaulted Debtors and the other Debtors.  Roche does not seek

permission at this time to enforce any judgment entered by the District Court against assets that

are property of any Debtor's estate under Section 541 of the Bankruptcy Code.  Roche

respectfully submits that there is ample cause to grant this request.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  Venue of this proceeding and this Motion is proper in this district pursuant to

28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

The statutory predicate for the relief sought is Section 362(d)(1) of the Bankruptcy Code.

## BACKGROUND

A.      **The Debtors' Priority Care Scheme**

8.      Because of the default judgment in the Alabama Action, the Defaulted

Debtors are deemed to have admitted the facts alleged in that complaint, thereby establishing

their liability for fraud and racketeering.[8]  The allegations are not only deemed admitted, they are

also established by undisputed evidence.  Explicit party admissions and extensive non-party

discovery provide ample documentary and testimonial evidence of the Defaulted Debtors'

offenses and the nature of their scheme.

9.      Defaulted Debtor Priority Healthcare Corporation ("PHC") was the

flagship company of the Priority Care RICO enterprise.  From PHC's Amory, Mississippi

---

[8] *See* Second Amended Complaint (Redacted), Dkt. No. 270-1.

headquarters, the Mingas directed PHC to submit a steady stream of insurance claims to

pharmacy benefit managers ("PBMs") representing that they were dispensing Roche's Accu-

Chek test strips to patients with diabetes who had Accu-Chek prescriptions.[9]  Each claim they

submitted (or "adjudicated," in industry parlance) stated that a "retail" box of Roche's test

strips—which are eligible for reimbursement under ordinary pharmacy-benefit insurance plans—

was dispensed.[10]  In hundreds of thousands of instances, however, those claims were false,

because Priority Care actually shipped to patients boxes of test strips that are *not* eligible for

reimbursement: either not-for-retail ("NFR") boxes of Accu-Chek test strips, which Roche sells

at much lower prices through specifically authorized channels, or boxes of Accu-Chek test strips

intended for international distribution, which are unlawful to distribute in the United States.[11]

10.      By submitting claims for more expensive strips and dispensing less

expensive ones, the Debtors earned tens of millions of dollars in illegitimate profits.[12]  Both the

corporate witness for PHC and the Mingas' son-in-law Daniel Knotts, who was an employee of

PHC and is a co-defendant in the Alabama Action, have admitted that Priority Care engaged in

this massive insurance fraud.[13]  Each of those claims, moreover, was attributed to one of Priority

Care's retail pharmacies, falsely indicating that the test strips mailed from Amory to patients

across the country had been dispensed to a patient in that pharmacy's community.

11.      As PHC's corporate witness has admitted, Priority Care's complex

corporate organization and ownership structure were specifically engineered to deceive PBMs

and manufacturers like Roche and facilitate Priority Care's fraud.[14]  In sum and substance, the

Mingas did business through a shifting proliferation of ostensibly independent pharmacies in

---

[9] *See id.* ¶¶ 127–134.
[10] *See id.* ¶¶ 129–130.
[11] *See id.* ¶¶ 151–155, 197–200.
[12] *See id.* ¶¶ 108–110.
[13] *See id.* ¶ 6; Dkt. No. 363 at 10–11, 14–15.
[14] *See* Dkt. No. 270-1 ¶ 214.

order to prevent PBMs and manufacturers from noticing that the Priority Care enterprise as a

whole was submitting an enormous number of insurance claims for retail Accu-Chek test strips.

        12.      The complexity of the Debtors' fraudulent business is reflected in the

complexity of this series of related bankruptcies.  PHC is among the 13 Chapter 11 Debtors who

are Priority Care entities or affiliates.  Five Chapter 11 Debtors are wholly owned by PHC (and

thus indirectly owned by Konie Minga): Priority Care Pharmacy 2, LLC; Priority Care Pharmacy

Solutions, LLC; Priority Care Pharmacy Staffing, LLC; Vickers Priority Care Pharmacy, LLC;

and Vincent Priority Care Pharmacy, LLC.  The remaining Chapter 11 corporate Debtors are

        a.      A Priority Care pharmacy owned by a different parent entity to disguise its

                connection to PHC and the Mingas (Main Street Drugs, LLC);

        b.      Entities that collected patients and prescriptions to fuel the test-strip

                scheme (Medpoint, Inc.; Professional Healthcare Staffing, LLC; and

                Defaulted Debtors Medpoint Advantage, LLC and Medpoint, LLC); and

        c.      Entities that concealed illegitimate proceeds from the scheme (KJM

                Holdings, LLC and Minga Investments, LLC).

**B.**    **Roche's Damages**[15]

        13.      Priority Care's fraud cost Roche tens of millions of dollars in lost profits

and out-of-pocket damages.  By dispensing NFR or international test strips when submitting

claims for retail test strips, Priority Care deprived Roche of the sale of a new box of test strips,

which it would otherwise have sold to that patient.[16]  Roche's damages for each false claim, then,

are the wholesale price Roche would have received for the retail box (which should have been

---

[15] *See generally* Dkt. No. 435.  Damages were calculated by Dr. Gregory Bell, a Ph.D. economist retained by Roche.
Because of a protective order entered in the Alabama Action, Roche filed the underlying Declaration of Dr. Bell
under seal in that court.  Upon entry of an appropriate order, Roche is prepared to offer that Declaration under seal
in this matter or for *in camera* inspection by the Court.
[16] *Id.* at 7–9.

dispensed to the patient), less the much smaller amount Roche actually received when it sold the

box of NFR or international strips (which were actually dispensed to the patient).[17]  Roche's

contracts with PBMs, moreover, required that it pay a rebate for each box of retail strips

dispensed, which substantially reimbursed PBMs for their payments to pharmacies.  Each false

claim submitted by Priority Care caused Roche to pay an unwarranted rebate.[18]

       14.     Furthermore, Roche found in discovery that even ostensibly legitimate

boxes of retail test strips that Priority Care adjudicated caused Roche lost-profit or rebate

damages.  It turned out that the "retail" strips that Priority Care sold had been originally sold into

the gray market by individual diabetes patients who had obtained them through insurance.[19]

Each box of these "post-consumer" strips that Priority Care dispensed to a patient and submitted

a claim for caused Roche to lose a sale of a new box, and caused Roche to pay a second,

duplicate rebate on the same post-consumer box.[20]

       15.     In total, the Mingas' racketeering scheme cost Roche $49,904,384 in

actual damages from lost sales, which entitles Roche to $149,713,152 in mandatory treble

damages under RICO.  Roche is also entitled to mandatory attorneys' fees and expenses of

$5,732,301.58 and seeks prejudgment interest of $10,989,950, for a total award of

$166,435,403.58.[21]  The Defaulted Debtors have submitted no contrary evidence or alternative

damages calculations.[22]

## C.    Roche's Claims and Litigation in the Alabama Action

       16.     To halt Priority Care's fraudulent claims for Roche test strips, Roche

commenced a civil action against the Debtors, as well as a number of their employees and

[17] *Id.*
[18] *See* Dkt. No. 270-1 ¶ 285; Dkt. No. 435 at 2–3, 15–16.
[19] Dkt. No. 435 at 9–14.
[20] *Id.* at 14.
[21] *Id.* at 25.
[22] *See* Dkt. Nos. 439, 441.

affiliates, in September 2018. *See* Complaint, *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 18-cv-1479-KOB (N.D. Ala. Sept. 11, 2018). In that complaint and two subsequent amended complaints, Roche asserted, *inter alia*, that the elaborate Priority Care scheme was a racketeering enterprise in violation of RICO; violated Alabama statutory and common-law fraud laws; and unjustly enriched the Debtors.[23] Among other things, Roche sought mandatory treble damages and attorneys' fees pursuant to RICO, as well as equitable remedies of restitution and disgorgement.[24]

17.     Litigation in the Alabama Action has been underway for nearly two years. In that time, Defendants have twice unsuccessfully moved to dismiss all of Roche's claims, requiring multiple rounds of briefing spanning hundreds of pages.[25] *See Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 407 F. Supp. 3d 1216 (N.D. Ala. 2019); *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 2:18-CV-01479-KOB, 2020 WL 2309874, at *2 (N.D. Ala. May 8, 2020). Roche, moreover, spent months litigating Debtors' numerous meritless motions to stay and challenges to legitimate non-party discovery requests, which required Roche to contest and defeat motions to quash and to pursue motions to compel in separate satellite proceedings.[26]

18.     Through its hard-won non-party discovery, as well as information voluntarily provided by defendant Daniel Knotts, Roche ultimately discovered that the Mingas fabricated scores of invoices they produced to Roche and had attempted to conceal millions of dollars in fraudulent proceeds less than two weeks after the case began.[27] To prevent further such fraud from thwarting meaningful recovery in the Alabama Action, Roche moved on

---

[23] *See* Dkt. No. 270-1 ¶¶ 298–365.
[24] *See id.*
[25] *See* Dkt. Nos. 103–113, 133, 140–143, 149–152, 371–377, 393, 397–401.
[26] *See* Dkt. No. 363 at 18–24; *see also* Dkt. Nos. 42, 46, 51, 80, 99, 153, 157–160, 179–183, 196, 200, 298, 344.
[27] *See* Dkt. No. 363 at 16.

October 23, 2019 for a temporary restraining order freezing certain Priority Care-linked assets

held in bank and investment accounts that were registered in the names of Debtors KJM

Holdings, LLC and Minga Investments, LLC, as well as non-Debtor defendant Capital Asset

Management, LLC.[28]

19.     The District Court issued the temporary restraining order and, following

an evidentiary hearing, granted Roche's motion for a preliminary injunction.[29]  By order of

November 7, 2019, the District Court required that the accounts at issue be liquidated and the

funds transferred to an interest-bearing account administered by the court, where they remain

"enjoined and held in constructive trust . . . to secure and preserve the availability of the relief

[Roche] seek[s] (including the equitable remedies of disgorgement and restitution) until the final

disposition of this action."[30]  That account currently contains approximately $43.3 million.

20.     On January 3, 2020, in light of the Debtors' pervasive and persistent

litigation misconduct, Roche filed a Motion for Sanctions seeking default judgment against the

Mingas and the corporate defendants.[31]  Pursuant to an Order to Show Cause,[32] those defendants

opposed Roche's motion, but failed to offer any substantive argument, or any evidence at all, to

justify or explain the misconduct Roche described.[33]  On May 8, 2020, Judge Bowdre granted the

motion, finding that Roche had "clearly and convincingly established that Defendants doctored

hundreds of critical discovery documents" and that the "Mingas' behavior in this case [was]

especially egregious because it directly undermine[d] the purpose of the judicial system: to

---

[28] *See id.*
[29] *See Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 2:18-CV-01479-KOB-HNJ, 2019 WL 5810312
(N.D. Ala. Nov. 7, 2019).  A copy of this decision is attached to this Motion as <u>Exhibit D</u>.
[30] Dkt. No. 291 at 4. A copy of this Order is attached to this Motion as <u>Exhibit E</u>.
[31] *See generally* Dkt. No. 363.
[32] Dkt. No. 382.
[33] Dkt. Nos. 388, 389.

determine facts and administer justice accordingly."[34]  By accompanying Order, Judge Bowdre

entered default judgment against the Mingas, PHC, Medpoint Advantage, and Medpoint LLC.[35]

**D.      The Debtors Commence a Chapter 11 Case Just Before Damages Are to Be Determined, But Continue to Litigate Despite the Automatic Stay**

21.      The May 8, 2020 Sanctions Order required Roche to submit evidence of

its damages and any memorandum of law by May 26, 2020; required the Defaulted Debtors to

submit any rebuttal evidence and memorandum by June 4, 2020; and, at Roche's request,

scheduled a hearing on damages for June 16, 2020.[36]  Roche timely filed its damages

memorandum and supporting evidence on May 26.[37]  On June 2, 2020, the Debtors commenced

these voluntary cases under Chapter 11 of the Bankruptcy Code, all represented by the same

counsel.  The next day, the Debtors filed a Suggestion of Bankruptcy in the Alabama Action,

explicitly invoking the automatic stay set forth in Section 362 of the Bankruptcy Code.[38]

22.      Despite the automatic stay, the Defaulted Debtors have continued to

aggressively litigate the Alabama Action.  Phillip Minga submitted his rebuttal damages

memorandum on June 4, 2020, stating that it was filed "[n]otwithstanding that [his] Voluntary

Petition stays [his] involvement in th[e] action."[39]  The other Defaulted Debtors—Konie Migna,

PHC, Medpoint Advantage, and Medpoint, LLC—subsequently submitted a response joining

Mr. Minga's memorandum in full, likewise noting that it was filed "[n]otwithstanding that [the]

Voluntary Petition stays their involvement in th[e] action."[40]  On June 8, 2020, the Defaulted

Debtors sought to have the District Court reconsider its entry of default judgment against them,

---

[34] Exhibit C at *9.
[35] Exhibit B.
[36] *Id.*
[37] Dkt. No. 435.
[38] Dkt. No. 438.
[39] Dkt. No. 439 at 1 n.1.
[40] Dkt. No. 441 at 1 n.1.

in the guise of a motion to set aside the default.[41]  On June 10, Judge Bowdre issued an order

acknowledging the automatic stay as to the Debtors and striking the motion for reconsideration.[42]

Judge Bowdre's June 10 order specifically (and correctly) notes that the automatic say "shall not

affect any proceedings involving the remaining Defendants who have not filed for bankruptcy."[43]

## RELIEF REQUESTED

23.    Roche respectfully requests entry of an order, substantially in the form

attached to this Motion as Exhibit F ("Proposed Order"), modifying the automatic stay pursuant

to Section 362(d) of the Bankruptcy Code to permit Roche to continue the Alabama Action

against both the Defaulted Debtors and the other Debtors.  Roche does not seek permission at

this time to enforce any judgment entered by the District Court against assets that are property of

any Debtor's estate under Section 541 of the Bankruptcy Code.[44]  Roche respectfully submits

that there is ample cause to grant this request.

## BASIS FOR RELIEF REQUESTED

24.    Section 362(d) of the Bankruptcy Code provides, in pertinent part, that

"[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from

the stay . . . such as by terminating, annulling, modifying, or conditioning such stay—(1) for

cause."  11 U.S.C. § 362(d)(1); *see also Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112,

114 (5th Cir. 1987) ("The automatic stay . . . is not incontestable, and a party in interest may file

---

[41] Dkt Nos. 442, 443.

[42] Dkt. No. 446.

[43] *Id.*

[44] Roche respectfully submits that, because the stay only protects property of the Debtors' estates, relief from the stay is not required to maintain the District Court's preliminary injunction nor for the District Court to convert the preliminary injunction into a permanent injunction.  *See, e.g., Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360, 1364 (Fed. Cir. 1999) (automatic stay did not free debtor "of the contempt orders and the injunctions upon which the contempt was based, all of which were entered before [debtor] suggested bankruptcy"); *Dominic's Rest. of Dayton v. Mantia*, 2010 U.S. Dist. LEXIS 39636, at *7 (S.D. Ohio 2010), *aff'd*, 683 F.3d 757 (injunctive relief regarding the use of property in commission of a tort is not prevented by the automatic stay).  Nevertheless, for the avoidance of doubt, the Proposed Order explicitly provides that the automatic stay does not alter or limit the scope of any injunctive relief that has been granted or may be granted by the District Court.

a motion in the bankruptcy court for relief from the stay under 11 U.S.C. § 362(a).").  "Because

§ 362 does not offer guidance as to what constitutes 'cause,' reviewing courts must determine

whether cause exists on a case-by-case basis."  *Matter of Reitnauer*, 152 F.3d 341, 343 n.4 (5th

Cir. 1998); *see also In re Tonthat*, No. 07-30315-H3-13, 2009 WL 2461041, at *2 (Bankr. S.D.

Tex. Aug. 7, 2009).  Accordingly, "[t]he decision whether or not to lift the automatic stay resides

within the sound discretion of the bankruptcy court."  *In re Garzoni*, 35 F. App'x 179, 181 (6th

Cir. 2002); *see also In re Lentino*, No. 98-20626, 1999 WL 77140 (5th Cir. Mar. 5, 1999) (citing

*In re Sonnax*, 907 F.2d 1280, 1288 (2d Cir. 1990) ("[T]he lifting of the stay is committed to the

sound discretion of the court . . . .")).

25.     Congress recognized when drafting the Bankruptcy Code that there would

often be sensible reasons to permit litigation pending against a debtor to remain in another forum

to ripen into a money judgment.  H.R. Rep. No. 595, 95th Cong., 1st Sess., 341 (1978) ("It will

often be more appropriate to permit proceedings to continue in their place of origin, when no

great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen

forum and to relieve the bankruptcy court from any duties that may be handled elsewhere.").

Courts in this district and others routinely modify the automatic stay for this purpose.  *See*, *e.g.*,

*In re Armstrong and Guy Law Office, LLC*, 2007 WL 4571152, at *1 (Bankr. S.D. Miss. Dec. 21,

2007) (cause "includes allowing an action to proceed to completion in another tribunal" (citing

*In re Curtis*, 40 B.R. 795, 799 (Bankr. D. Utah 1984))).

26.     "Courts have used a broad range of factors in finding cause to grant relief

[from the automatic stay] including: the interests of judicial economy and the expeditious and

economical resolution of litigation; whether litigation in another forum would prejudice the

interests of other creditors; and the impact of the stay on the parties and the balance of harms."

*Hiller v. Hiller*, No. CV H-05-3008, 2006 WL 8446271, at \*3 (S.D. Tex. July 28, 2006); *see also*

*In re Armstrong and Guy Law Office, LLC*, 2007 WL 4571152, at \*2 (Bankr. S.D. Miss. Dec. 21,

2007) (identifying twelve non-dispositive factors that might be considered in evaluating a motion

for relief from an automatic stay).  Roche respectfully submits that all of the relevant factors

support a finding of cause to modify the stay in <u>both</u> the Defaulted Debtors' cases <u>and</u> in the

other Debtors' cases.

        27.   <u>First</u>, because the only remaining issue in the District Court as to the

Defaulted Debtors is the precise amount of Roche's claim, modification of the automatic stay

serves the interests of judicial economy.  The parties have completed multiple rounds of briefing,

the District Court has entered judgment against the Defaulted Debtors, and Roche has submitted

evidence of its damages (including an expert report) and other amounts due from the Defaulted

Debtors (*i.e.*, interest and fees).  Modifying the automatic stay will not place any burden on the

Defaulted Debtors at all.  For one thing, there is nothing more for them to do:  Judge Bowdre is

intimately familiar with the complex fraudulent scheme and corporate structure that gave rise to

Roche's claims, and she had already scheduled a hearing to fix the precise quantum due to

Roche.[45]  *In re Verges*, No. CIV. A. 92-80, 1992 WL 77791, at \*5 (E.D. La. Apr. 8, 1992) ("[I]t

is within the sound discretion of bankruptcy courts to grant relief from the automatic stay when

the bankruptcy petition was filed on the eve of the resolution of pending prepetition litigation."

(citing *In re Wilson*, 85 B.R. 722, 728 (Bankr. E.D. Pa. 1988)).  For another, the Defaulted

Debtors submitted legal arguments and evidentiary objections in response to Roche's damages

submission *after the Petition Date, when the automatic stay was already in place*.  Having

---

[45] In fact, such a hearing is not even necessary:  Judge Bowdre is not required to hold a default damages hearing
when "all essential evidence is already of record."  *Giovanno v. Fabec*, 804 F.3d 1361, 1366 (11th Cir. 2015).

chosen to continue to litigate in another forum, the Defaulted Debtors cannot credibly claim that

allowing Judge Bowdre to finalize a money judgment against them would be a burden.

28.     The Alabama Action is also at an advanced stage against the Debtors that

are not Defaulted Debtors.  Roche understands that most of the Debtors have completed

document production, and Roche does not anticipate seeking further discovery from them.

Given the advanced stage of the Alabama litigation against the Debtors that are not Defaulted

Debtors—not to mention the significant effort that Roche has expended in litigating its claims

thus far—it would be "manifestly unfair to ask [Roche] to begin anew in this Court at significant

and duplicative expense." *In re Armstrong and Guy Law Office, LLC*, 2007 WL 4571152, at *4;

*id.* at *2 (concluding that modification of automatic stay to allow liquidation of creditors' claims

in another court would be "more efficient than starting anew in this Court").

29.     Nor will it place any burden on these other Debtors to defend the claims

against them in the District Court.  Many of those Debtors are wholly owned by PHC, a

Defaulted Debtor, so a final judgment against PHC would effectively end the case against them.

All of the Debtors are controlled by and *de facto* extensions of the Mingas.  And, all of these

Debtors are represented by the same counsel that represents certain of the Defaulted Debtors.

30.     Finally, as Judge Bowdre's June 10 order correctly notes, the Alabama

Action is not stayed and will continue against the defendants in that action that are not Debtors.

So, it would be more efficient for all of the claims in the Alabama Action to be adjudicated to

final judgment in that one single forum.  Excising certain claims against certain defendants from

the Alabama Action so that they can be relitigated from the start in the Bankruptcy Court would

be inefficient and unnecessary.

31.     <u>Second</u>, modification of the automatic stay to allow liquidation of Roche's

claims against the Defaulted Debtors and resolve the claims against the remaining Debtors will

not prejudice the Debtors or their creditors.  To the contrary, lifting the stay should help the

expeditious administration of this bankruptcy case because it will enable a prompt and cost-

effective resolution of Roche's claims against all of the Debtors.  Liquidation of the claims

against the Defaulted Debtors will be efficient because they are not entitled to a jury trial on their

damages, *see Henley v. Coosa Pines Golf Club LLC*, No. 1:10-cv-72-TMP, 2011 U.S. Dist.

LEXIS 163297, at *13 n.2 (N.D. Ala. Feb. 15, 2011); *In re Dierschke*, 975 F.2d 181, 185 (5th

Cir. 1992), nor is a hearing to determine damages even necessary now that Roche has submitted

extensive documentation of damages and the Debtors have submitted no evidence to the

contrary.[46]  By contrast, if relief from the stay is not granted, then Roche's claims against the

Debtors—including the Defaulted Debtors, for whom the case is all but over—will have to be

adjudicated anew in this Court (in the context of claims litigation), which would substantially

delay resolution of the Debtors' bankruptcy cases.  *See In re Armstrong and Guy Law Office,*

*LLC*, 2007 WL 4571152, at *2, *4.

32.     Moreover, modifying the stay will not prejudice creditors because Roche

<u>does</u> <u>not</u> seek relief to enforce or collect upon any property of any Debtor's estates.  Roche

merely seeks the final adjudication of its non-bankruptcy rights against the Debtors in the

District Court, where the case has been pending for nearly two years before a Judge who has

become intimately familiar with the nature and extend of the Debtors' fraud.  *In re Wells*, No.

08-80206-G3-13, 2008 WL 4179238, at *2 (Bankr. S.D. Tex. Sept. 5, 2008) (finding no

---

[46] *See* n.45, *supra*.

"prejudice to Debtor or the bankruptcy estate" from allowing creditor to liquidate its claim in

state court, where creditor would not be "permitted to execute on any judgment it may obtain").[47]

33.     <u>Third</u>, the balance of harms greatly favors a modification of the automatic

stay.  As described above, Roche's path to justice has required extraordinary effort and expense

due to the Debtors' deliberately byzantine corporate structures, opaque finances, and litigation

misconduct.  In an effort to shield their fraudulent business practices and considerable assets

from Roche and the District Court's jurisdiction, they fought legitimate discovery efforts and

forced Roche to file motions to compel in satellite proceedings before other courts.  *See supra*.

For Roche to bear the burden of instructing yet another court about the full extent of the Debtors'

fraudulent businesses would be deeply unfair.

34.     For all of the foregoing reasons, Roche respectfully submits that there is

ample "cause" for this Court to enter the Proposed Order modifying the automatic stay pursuant

to Section 362(d)(1) of the Bankruptcy Code.

## **NOTICE**

35.     Notice of this Motion will be provided to the Debtors and all parties

requesting notice pursuant to Bankruptcy Rule 2002.  Roche respectfully submits that such

notice is good and sufficient under the circumstances and that no other or further notice is

required.

---

[47] Roche also reserves the right to rely on the District Court's judgment that the Defaulted Debtors committed fraud in support of an action, which would be commenced in this Court, to determine that its claims against the Debtors should be excepted from any discharge granted to them. *See, e.g.*, 11 U.S.C. §§ 523(a)(2), (4), and (6).  This reservation is reflected in the Proposed Order.

## **CONCLUSION**

WHEREFORE, Roche respectfully requests that the Court (a) enter the Proposed

Order modifying the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code to

permit Roche to continue the Alabama Action against both the Defaulted Debtors and the other

Debtors, and (b) grant it such other and further relief as the Court deems just and proper.

Dated:  June 11, 2020

Respectfully submitted,

*/s/ Thomas M. Hewitt*
Thomas M. Hewitt (Miss. Bar No. 104589)
Christopher R. Maddux (Miss. Bar No. 100501)
**BUTLER SNOW LLP**
1020 Highland Colony Parkway, Suite 1400
Ridgeland, Mississippi 39157
Telephone: (601) 945-4415
Fax: (601) 985-4500
thomas.hewitt@butlersnow.com
chris.maddux@butlersnow.com

AND

**PATTERSON BELKNAP WEBB & TYLER
LLP**
Geoffrey Potter
Aron Fischer
Brian P. Guiney
Timothy H. Gray
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

53346510.v1

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas M. Hewitt, certify that the foregoing Notice was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically.

Dated: June 11, 2020.

*/s/ Thomas M. Hewitt*
Thomas M. Hewitt

# Exhibit A

| Case Number | Debtor Name |
|---|---|
| 20-11955-SDM | *Phillip A. Minga and Konie D. Minga\** |
| 20-11956-SDM | *Priority Healthcare Corporation\** |
| 20-11957-SDM | MedPoint, Inc. |
| 20-11958-SDM | Main Street Drugs, LLC |
| 20-11959-SDM | *MedPoint Advantage, LLC\** |
| 20-11960-SDM | *MedPoint, LLC\** |
| 20-11961-SDM | Priority Care Pharmacy 2, LLC |
| 20-11962-SDM | Priority Care Pharmacy Solutions, LLC |
| 20-11963-SDM | Priority Care Professional Staffing, LLC |
| 20-11964-SDM | Professional Healthcare Staffing, LLC |
| 20-11965-SDM | Vickers Priority Care Pharmacy, LLC |
| 20-11966-SDM | Vincent Priority Care Pharmacy, LLC |
| 20-11967-SDM | KJM Holdings, LLC |
| 20-11968-SDM | Minga Investments, LLC |

An asterisk (*) denotes each of the "Defaulted Debtors" as that term is defined in the Motion.

# Exhibit B

FILED
2020 May-08 PM 02:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ROCHE DIAGNOSTICS CORP., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:18-CV-01479-KOB** |
| | ) | |
| **PRIORITY HEALTHCARE CORP.,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER GRANTING IN PART MOTION FOR SANCTIONS**

This matter comes before the court on Plaintiff Roche's motion for sanctions against Defendants Phil Minga, Konie Minga, and all 34 Corporate Defendants in this case. (Doc. 362.) As explained in the accompanying memorandum opinion, because Roche failed to specifically allege or provide evidence to clearly and convincingly demonstrate that all 34 of the Corporate Defendants engaged in bad-faith behavior, the court DENIES Roche's motion regarding all Corporate Defendants except Medpoint Advantage, LLC (including "Medpoint, LLC") and Priority Healthcare Corp.

But because Roche presents clear and convincing evidence that Phil Minga; Konie Minga; Priority Healthcare Corp; and Medpoint Advantage, LLC (including "Medpoint, LLC") engaged in sanctionable conduct by producing hundreds of falsified documents in discovery and then refusing to acknowledge their fraud, the court GRANTS Roche's motion to sanction these four Defendants and enters DEFAULT JUDGMENT against them.

Pursuant to Roche's request for an inquest, the court ORDERS a hearing before the court, set at 10:00 a.m. on Tuesday, June 16, 2020 in Courtroom 5A of the Hugo L. Black Federal

Courthouse in Birmingham, Alabama to determine the appropriate amount of damages. Roche

SHALL submit evidence to the court to support the claimed amount of damages by May 26,

2020. Sanctioned Defendants SHALL submit any rebuttal evidence by June 4, 2020. The parties

*may* also submit briefs by the same respective dates, if they so desire.

  **DONE** and **ORDERED** this 8th day of May, 2020.

                   _Karon O. Bowdre_
                   **KARON OWEN BOWDRE**
                   UNITED STATES DISTRICT JUDGE

# Exhibit C

2020 WL 2308319
Only the Westlaw citation is currently available.
United States District Court, N.D.
Alabama, Southern Division.

ROCHE DIAGNOSTICS CORP., et al., Plaintiffs,

v.

PRIORITY HEALTHCARE
CORP., et al., Defendants.

Case No. 2:18-CV-01479-KOB
|
Signed 05/08/2020

**Attorneys and Law Firms**

Aron Fischer, Pro Hac Vice, Geoffrey Potter, Pro Hac Vice, Timothy Gray, Pro Hac Vice, Patterson Belknap Webb & Tyler LLP, New York, NY, David J. Canupp, James Bradley Emmons, LaNier Ford Shaver & Payne PC, Huntsville, AL, for Plaintiffs.

Bruce F. Rogers, Charles K. Hamilton, Jennifer A. Hanson, Bainbridge Mims Rogers & Smith LLP, Amie Adelia Vague, Christine E. Gwinn-Ross, Harlan Irby Prater, IV, Jackson R. Sharman, III, Jeffrey P. Doss, Wesley B. Gilchrist, Lightfoot Franklin & White LLC, Birmingham, AL, Annie Friedman, Derrelle M. Janey, Gottlieb & Janey LLP, New York, NY, for Defendants Priority Healthcare Corporation, Priority Care Pharmacy LLC, Amory Priority Care Pharmacy LLC, Priority Care Pharmacy Services LLC, Priority Care Medical Supply LLC, Priority Care Pharmacy Solutions LLC, Amory Discount Pharmacy LLC, Priority Care Pharmacy at Cotton Gin Point LLC, Priority Care Pharmacy 2 LLC, Jasper Express Care Pharmacy LLC, Vincent Priority Care Pharmacy LLC, Vincent Express Care Pharmacy LLC, Vickers Priority Care Pharmacy LLC, Carbon Hill Express Care Pharmacy LLC, Bowies Priority Care Pharmacy LLC, Bowies Express Care Pharmacy LLC, B&K Priority Care Pharmacy LLC, B&K Express Care Pharmacy LLC, Tombigbee Pharmacy LLC, Main Street Drugs LLC, Medical Park Discount Pharmacy LLC, Burns Discount Drug Store LLC, Ozark Family Pharmacy LLC, Medpoint Advantage LLC, Medpoint Pharmacy Benefit Managers.

Bruce F. Rogers, Charles K. Hamilton, Jennifer A. Hanson, Bainbridge Mims Rogers & Smith LLP, Amie Adelia Vague, Christine E. Gwinn-Ross, Harlan Irby Prater, IV, Jackson R. Sharman, III, Jeffrey P. Doss, Wesley B. Gilchrist, Lightfoot

Franklin & White LLC, Samuel R. McCord, Sr., Birmingham, AL, Annie Friedman, Derrelle M. Janey, Gottlieb & Janey LLP, Michael Fred Bachner, Pro Hac Vice, Bachner and Associates, PC, New York, NY, for Defendant Konie Minga.

Richard E. Smith, Richard M. Thayer, Christian & Small LLP, William C. Athanas, Helen Lynne Eckinger, Waller Lansden Dortch & Davis LLP, Amie Adelia Vague, Christine E. Gwinn-Ross, Harlan Irby Prater, IV, Jackson R. Sharman, III, Jeffrey P. Doss, Wesley B. Gilchrist, Lightfoot Franklin & White LLC, Birmingham, AL, Annie Friedman, Derrelle M. Janey, Gottlieb & Janey LLP, New York, NY, for Defendant Daniel Baker.

John W. Clark, IV, Clark Law Firm PC, Leigh Anne Hodge, Hillary Chinigo Campbell, Bradley Arant Boult Cummings LLP, Birmingham, AL, for Defendants Samuel Phillip Carson, Kimberly P. Carson.

Bruce F. Rogers, Charles K. Hamilton, Jennifer A. Hanson, Bainbridge Mims Rogers & Smith LLP, Birmingham, AL, for Defendants Monroe Pharmacy Corporation, Razorback Pharmacy Services, Inc., Medpoint, Inc., Priority Express Care Pharmacy, LLC, Priority Care Proffessional Staffing, LLC, Yellowhammer Pharmacy Services Corporation, Professional Healthcare Staffing, LLC, Medpoint LLC.

Richard E. Smith, Richard M. Thayer, Christian & Small LLP, William C. Athanas, Helen Lynne Eckinger, Waller Lansden Dortch & Davis LLP, Birmingham, AL, for Defendants Heather Baker, Kristen Knotts, Wesley Minga, Geneva Oswalt, Melissa Sheffield, Ashley Tigrett.

Samuel Robert McCord, Samuel R. McCord, Sr., Birmingham, AL, for Defendants Capital Asset Management, LLC, Minga Investments, LLC, KJM Holdings, LLC.

George W. Walker, III, Boles Holmes Parkman and White, LLC, Auburn, AL, Jeffrey Nathaniel Holmes, Mitchel H. Boles, Suzanne Rebecca Norman, Boles Holmes Parkman White, LLC, Birmingham, AL, for Defendant Phillip Anthony Minga.

John W. Scott, Scott Dukes & Geisler PC, Birmingham, AL, for Defendant William H. Austin.

Christopher Daniel Knotts, Amory, MS, pro se.

**MEMORANDUM OPINION**

KARON OWEN BOWDRE, UNITED STATES DISTRICT JUDGE

 **\*1**  The American judicial system depends on the integrity of the participants, who seek the truth through the adversarial but good-faith presentation of arguments and evidence. A party who knowingly distorts or conceals the truth undermines the integrity of the process and maligns justice itself. Because deceit invariably leads to injustice, fabricating or falsifying evidence violates every "principle implicit in any concept of ordered liberty," *Anderson v. Sec'y for the Dep't of Corr.*, 462 F.3d 1319, 1324 (11th Cir. 2006), and merits the highest degree of sanction.

Regrettably, this matter comes before the court on claims that certain parties engaged in many types of sanctionable conduct, including defrauding the court by fabricating important evidentiary documents. Plaintiff Roche filed the instant motion for sanctions against Defendants Phil Minga, Konie Minga, and all 34 Corporate Defendants [1] in this case. (Doc. 362.) The court ordered Defendants to show cause why the court should not grant Roche's motion. Phil Minga (Doc. 388) and Konie Minga and the Corporate Defendants (Doc. 389) both responded to the court's order; [2] Roche submitted a consolidated reply brief to both responses. (Doc. 396.)

 **\*2**  Roche's motion for sanctions specifically asks the court to both grant default judgment against these 36 Defendants and schedule a hearing to determine the amount of damages. (Doc. 363 at 48.) Because the evidence before the court clearly and convincingly shows that Phil Minga, Konie Minga, Priority Healthcare (PHC), and Medpoint Advantage, LLC engaged in egregious bad-faith behavior by falsifying hundreds of key discovery documents and refusing to acknowledge their fraud, the court will GRANT Roche's motion regarding these four Defendants but will DENY the motion as to all other Defendants.

## Background

Roche—an international healthcare conglomerate and, most relevantly, a diabetic test strip manufacturer—filed the instant suit on September 11, 2018, bringing claims against approximately 40 Defendants for common law and statutory fraud, conspiracy to commit fraud, negligent misrepresentation, unjust enrichment, and violations of the Racketeer Influenced and Corrupt Organizations Act. (Docs. 1, 90, 306.) Roche alleges that both Individual and Corporate Defendants submitted fraudulent rebate adjudications to

insurance companies and pharmacy benefit managers (PBMs) for Roche's test strips, costing Roche more than $30 million. Roche avers that spouses Konie and Phil Minga lead the enterprise, with Konie Minga owning the Corporate Defendants and Phil Minga acting as the *de facto* director of the scheme. Roche specifically contends that the primary Corporate Defendant, PHC, owns or operates all the other Corporate Defendants as subsidiaries for the purpose of generating, submitting, and processing fraudulent insurance claims related to Roche's test strips.

The procedural history of this case is distinctly non-linear—featuring multiple complaints, dispositive and reconsideration motions, and stays of discovery, as well as a preliminary injunction and an ever-lengthening tally of former defense counsel. And according to Roche's instant motion for case-ending sanctions, the suit has also featured pervasively opprobrious behavior by multiple Defendants. To support its motion for sanctions, Roche alleges that Defendants engaged in the following actions:

- disclosing hundreds of digitally altered test-strip invoices in response to the court's discovery order;

- repeatedly refusing in another case to comply with a judge's order to compel discovery and incurring $100,000 in fines and a finding of contempt;

- making multiple false statements under oath in a deposition in another case;

- spoliating evidence by hiding and/or destroying thousands of boxes of test strips in the two days following service of process in this case;

- lying about the existence of inventory that Roche later independently discovered;

- surreptitiously transferring $15 million in assets within days after Roche filed the instant suit;

- violating court orders by failing to disclose businesses, assets, and accounts;

- sending bad-faith and false statements to third-party financial institutions to delay discovery;

- filing bad-faith motions to quash subpoenas and delay discovery;

- making up fake companies to create false documents produced in discovery;

- generally not complying with reasonable discovery requests;

- harassing a party/witness with a frivolous restraining order; and

- lying to the court about the purposes of financial accounts.

Roche pairs this exceptional number of allegations with a commensurate large body of evidentiary material, including invoices, depositions, hearing transcripts, emails, and financial documents. (Docs. 366-1–366-52.) Although Roche asks the court to sanction most of the Defendants in this case, it does not bring the instant motion against the three Asset-holding Defendants or eleven of the Individual Defendants. [3]

**Standard**

 **\*3**  The court first notes that Defendants argue that Roche should have brought its motion for sanctions pursuant to *Federal Rule of Civil Procedure 11(c)*, which provides the mechanism for sanctioning *attorneys'* conduct. (Doc. 388 at 8.) The court rejects this argument because Roche does not allege that any of the lawyers who have previously represented Defendants did anything to deserve sanctions. So, *Rule 11(c)* does not apply here.

Roche instead asks the court to issue case-ending sanctions based on *Federal Rule of Civil Procedure 37* and the court's inherent sanctioning power. (Doc. at 28.) *Rule 37* governs sanctions pursuant to discovery-related misconduct only, but a court may exercise its inherent sanctioning power to punish all types of contumacious conduct committed by parties, counsel, or both. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993). Inherent sanctioning power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

The Supreme Court warned that courts must "exercise caution in invoking [their] inherent power, and … must comply with the mandates of due process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Although sanction-issuing courts should ordinarily rely on procedural rules or statutes when these black-letter provisions clearly apply to the sanctionable conduct at issue,

courts should instead exercise their inherent powers when "the conduct sanctionable under the Rules [is] intertwined within conduct that only the inherent power could address." *Id.* at 51, 111 S.Ct. 2123. *See also Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) ("[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct, for these rules are not substitutes for the inherent power.") In this case, Roche alleges Defendants engaged a variety of both discovery- and non-discovery-related sanctionable conduct—most notably fabricating material evidence and lying under oath.

"The key to unlocking a court's inherent power [to sanction] is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). "A party demonstrates bad faith by, *inter alia*, delaying or disrupting the litigation or hampering enforcement of a court order." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009). One court in this circuit explained that "[b]ad faith exists when the court finds that a fraud has been practiced upon it, or that 'the very temple of justice has been defiled,' or where a party or attorney knowingly or recklessly raises a frivolous argument." *Allapattah Servs. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) (citing *Chambers*, 501 U.S. at 46, 111 S.Ct. 2123). A court's sanctioning power, even to invoke the "ultimate sanction" of terminating a case, "cuts both ways"—that is, it applies to both plaintiffs and defendants. *See Chemtall, Inc. v. Citi-Chem, Inc.*, 992 F. Supp. 1390, 1409–10 (S.D. Ga. 1998) (listing cases where courts dismissed defendants for plaintiffs' behavior and entered default judgments for defendants' behavior.)

"[T]he inherent powers doctrine is most often invoked where a party commits perjury or destroys or doctors evidence." *Qantum Communs. Corp. v. Star Broad., Inc.*, 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007). *See, e.g., Vargas v. Peltz*, 901 F. Supp. 1572, 1581–82 (S.D. Fla. 1995); *Chemtall, Inc.*, 992 F. Supp. at 1410; *McDowell v. Seaboard Farms*, CASE NO. 95-00609, 1996 WL 684140 at \*9–10, 1996 U.S. Dist. LEXIS 19558 at \*27 (M.D. Fla. Nov. 4, 1996). In addition, "several federal courts have held that the need for sanctions is heightened when the misconduct relates to the pivotal or linchpin issue in the case." *People For The Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*, No. 8:16-cv-2899-T-36AAS, 2020 WL 897988 at \*5, 2020 U.S. Dist. LEXIS 31853 at \*13-14 (M.D. Fla. Feb. 25, 2020) (citation omitted). *See, e.g., Vargas*, 901 F. Supp. at 1582; *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1049 (8th Cir. 1991).

*4 Because Roche alleges that Defendants engaged in a variety of bad-faith behavior, including doctoring "linchpin" evidence and committing perjury, the court will consider Roche's allegations of Defendants' bad-faith conduct pursuant to the court's inherent sanctioning power rather than Rule 37. *See Qantum Communs. Corp.*, 473 F. Supp. 2d at 1269.

The Eleventh Circuit has not specified the appropriate evidentiary standard for a court to apply when exercising its inherent power to order case-ending sanctions pursuant to a party's misconduct. Some courts in this circuit have held that case-ending sanctions are necessary when clear and convincing evidence shows that the sanctionable conduct occurred and that lesser sanctions will not effectively punish the wrongdoer or deter similar conduct in the future. *See, e.g., Chemtall Inc.* at 1408 (a "district court may use its inherent power to enter a default judgment only if it finds, first, by clear and convincing evidence—a preponderance is not sufficient —that the abusive behavior occurred; and second, that a lesser sanction would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits" (citing *Richardson v. Union Oil Co.*, 167 F.R.D. 1, 4 (D.D.C. 1996)); *see also Cadle Co. v. Moore*, 739 F.3d 724, 730 (5th Cir. 2014) (determining that clear and convincing evidence is the appropriate standard). *But see Zeltser v. Little Rest Twelve, Inc.*, 662 F. App'x 887, 889 (11th Cir. 2016) (finding that "no binding precedent" exists in the Eleventh Circuit that requires a court exercising its inherent sanctioning power over an *attorney* to apply the clear and convincing evidence standard; instead the court should merely "make specific findings as to the party's conduct that warrants sanctions"); *People For The Ethical Treatment of Animals, Inc.*, No. 8:16-cv-2899, 2020 WL 897988, at *11, 2020 U.S. Dist. LEXIS 31853, at *34 (noting that the appropriate standard for sanctioning parties "lacks discussion from the Eleventh Circuit.").

Regardless of the standard, the Eleventh Circuit has clearly pronounced that "district courts have broad discretion to determine whether to impose sanctions and the nature or amount of those sanctions." *Peer*, 606 F.3d at 1316. Out of an abundance of caution, the court chooses to apply the clear and convincing evidence standard to Roche's claims of Defendants' bad-faith behaviors. Although what constitutes clear and convincing evidence "is not susceptible to precise definition," the standard falls on the spectrum between preponderance of the evidence and beyond a reasonable doubt. *Collins & Aikman Floor Coverings, Inc. v. Interface, Inc.*, No. 4:05-CV-0133, 2009 U.S. Dist. LEXIS 134835,

at *16 (N.D. Ga. Feb. 25, 2009). "Clear and convincing evidence is a demanding but not insatiable standard, requiring proof that a claim is highly probable." *Nejad v. AG, Ga.*, 830 F.3d 1280, 1289 (11th Cir. 2016) (internal citation omitted).

**Analysis**
The court first notes that, in response to Roche's significant body of evidence demonstrating Defendants' bad-faith behavior, Defendants produced *no evidence of any kind*—not so much as an affidavit or sworn statement. The court ordered Defendants to show cause why sanctions are inappropriate, and in response, Defendants have only offered a handful of legal arguments. Phil Minga stated, in a footnote and without further explanation, that he "does not believe any additional evidentiary submissions are required" (Doc. 388 at 2), and Konie Minga and the Corporate Defendants, also in a footnote, stated that "[i]f this Court is inclined to give serious credence to Roche's motion," then "Defendants request an evidentiary hearing or the opportunity to submit evidence in opposition to Roche's allegations." (Doc. 389 at 7.)

*5 The court indeed gives serious credence to Roche's motion—so much credence, in fact, that the court *ordered* Defendants to show cause why the court should not grant the motion. (Doc. 382.) But instead of showing cause, Defendants spurned the very "opportunity to submit evidence" the court presented them. (*See* Doc. 389 at 7.)

For Konie Minga and the Corporate Defendants, the show-cause order presented only the most recent chance to submit evidence to combat Roche's allegations of Defendants' post-complaint misconduct. Pursuant to the preliminary injunction evidentiary hearing before the court on October 30, 2019, Roche presented much of the same evidence it provides to support the instant motion. *See, e.g.,* (Docs. 276, 277.) But just as now, Defendants presented no evidence in response.

Nor did Defendants' responses to the court's current show-cause order explicitly invoke any Fifth Amendment right to silence. Although one of the briefs refers generally to "Fifth Amendment concerns" (Doc. 381 at 21) pursuant to Phil and Konie Minga's involvement in a related criminal matter in a neighboring forum, even an express invocation of the constitutional right of silence would not prevent the court from drawing adverse inferences from Defendants' continued silence. *See Eagle Hosp. Physicians*, 561 F.3d at 1304 (holding that the "decision to invoke the Fifth Amendment does not have to be consequence-free," and a court should give "proper evidentiary weight to reasonable

adverse inferences" for a party's refusal to testify.) Here, none of the Defendants have invoked the Fifth Amendment right to silence. But even if they had, their conspicuous and repeated failure to produce even a scintilla of evidence to contradict any of Roche's assertions strongly suggests no such evidence exists.

Although Defendants produced no evidence in response to the court's show-cause order, they present two persuasive legal arguments to partially rebuff Roche's assertions. First, Roche's allegations are generalized and do not adequately explain each Defendants' role in the bad-faith activities. Second, many of Roche's allegations relate to activity that occurred either pursuant to another lawsuit or before Roche filed the instant case. The court addresses both arguments below.

### Specificity of allegations and evidence

Roche asks the court to sanction Phil Minga, Konie Minga, and all 34 Corporate Defendants. As the court explains below, Roche provides clear and convincing evidence of four Defendants' bad-faith behavior; but the assertions concerning most of the Corporate Defendants are far too generalized to be persuasive. Virtually absent from Roche's sanctions brief are specific allegations to all but two of the Corporate Defendants' putative misdeeds. By the court's count, Roche's brief refers to all "Defendants" 159 times and "Corporate Defendants" six times without specifying which of the Corporate Defendants allegedly acted in bad faith.

On the other hand, Roche's allegations and evidence pertaining to PHC; Medpoint Advantage, LLC; [4] Phil Minga; and Konie Minga are particularized and convincing. Whereas Roche generally alleges that the "Corporate Defendants" falsified documents, for example, Roche also provides deposition evidence to show that these same documents were "maintained in the custody of, and produced by, Phillip and Konie Minga, who together direct and oversee the Corporate Defendants' operations." (Doc. 363 at 17, 22.) *See also* (Docs. 284, 366-1 at 15–19, and 366-12 at 25) (featuring the testimony of Geneva Oswalt, Phillip Carson, and Christopher Daniel Knotts, who corroborate that Phil and Konie Minga managed and controlled PHC's financial transactions and physically gave Geneva Oswalt, PHC's Rule 30(b)(6) deponent, key documents to give to Roche.) Roche also provides evidence to show that either Phil Minga, Konie Minga, or both specifically manipulated evidence concerning Medpoint Advantage to minimize Medpoint Advantage's

liability and damages. (Docs. 366 at 11–12; 366-23; 366-24.) Ultimately, as explained below, Roche has provided clear evidence that Medpoint Advantage and PHC—acting through owners and operators Phil and Konie Minga—deliberately perpetrated fraud on Roche and the court by altering hundreds of critical discovery documents.

**\*6** But the Supreme Court has admonished courts to "exercise caution" and "comply with the mandates of due process" when issuing sanctions pursuant to their inherent power. *Chambers,* 501 U.S. at 50, 111 S.Ct. 2123. Although the links between PHC and all other Corporate Defendants appear to be strong, the court is reluctant to impute sanctionable behavior to all 34 Corporate Defendants when Roche has not given the court clear and convincing evidence to determine which Defendants assisted with—or even knew about—the Mingas' post-suit fraud. In short, the "mandates of due process" require that Roche provide more than generalized assertions. *See Chambers,* 501 U.S. at 50, 111 S.Ct. 2123. Because Roche's lack of specificity fails to conclusively show that each Corporate Defendant committed sanctionable behavior, the court will DENY the motion for sanctions regarding all Corporate Defendants except PHC and Medpoint Advantage.

### Conduct not before this court

Defendants correctly point out that much of Defendants' potentially sanctionable activity took place before another court, prior to Roche filing the instant suit. For example, Roche's allegation of perjury draws from a deposition of Konie Minga taken pursuant to a case before the United States District Court for the Southern District of Indiana, *Roche Diagnostics Corp. v. Binson's Hosp. Supplies, Inc.,* No. 1:17-cv-00949, 2017 WL 4123050, 2017 U.S. Dist. LEXIS 150853 (S.D. Ind. Sep. 18, 2017). Although Roche truthfully contends that Defendants failed to comply with orders to compel discovery (and incurred a finding of contempt and an order to pay Roche's attorneys' fees in doing so), these behaviors occurred pursuant to non-party discovery in the *Binson's* case that Roche brought before a colleague on the court (*Roche Diagnostics Corp. v. Binson's Hosp. Supplies, Inc.,* No. 2:18-mc-00521-AKK (N.D. Ala.)) and in a neighboring forum (*In re: Subpoena Issued to Gathright Reed Medical Supply LLC, et al.,* No. 3:18-mc-00007 (N.D. Miss.))

Roche cites to *Mishkin v. Jeannine Gurian Tr. No. One,* No. 06-80489, 2008 WL 708733, at *3, 2008 U.S. Dist. LEXIS 20038, at *8 (S.D. Fla. Mar. 12, 2008) to support the proposition that this court should consider Defendants'

behavior in the *Binson's* case in the overall sanctions analysis. In *Mishkin*, the court sanctioned a pair of fugitives for their behavior in consolidated cases and in the case that "form[ed]' the basis of these proceedings." *Id.* at *3, 2008 U.S. Dist. LEXIS 20038, 2008 WL 708733, at *8. Roche also cites to *In re Costello*, 176 B.R. 592, 594 (Bankr. M.D. Fla. 1994), where the court sanctioned a party who filed several bad-faith cases in multiple courts to avoid paying her debts.

One court in this circuit opined that "[w]hen considering sanctions, a district court may consider all the circumstances surrounding the alleged violations, including a party's misconduct in related cases." *Qantum Communs. Corp.*, 473 F. Supp. 2d at 1275. But the Eleventh Circuit has not provided clear guidance on how "related" cases must be before a court may sanction a party's conduct that occurred in another case before another court. *But see Woodard v. STP Corp.*, 170 F.3d 1043, 1045 (11th Cir. 1999) (determining, in the context of sanctioning attorneys under Fed. R. Civ. P. 11, that "sanctions are properly applied only to cases before the court, not to cases in other courts.")

In both cases Roche cites, the sanctioning court considered behavior in other cases that shared obvious linkages to its own case, *e.g.*, the cases were consolidated or involved the same parties and issues. *Mishkin*, No. 06-80489, 2008 WL 708733, at *3, 2008 U.S. Dist. LEXIS 20038, at *8; *In re Costello*, 176 B.R. at 594. Here, by contrast, Roche does not explain how the *Binson's* case—to which Defendants apparently were not parties—relates in any meaningful way to the case at bar. Furthermore, the fact that Defendants were held in contempt and ordered to pay Roche's attorneys' fees suggests that Defendants already received the appropriate punishment for at least some of their prior misdeeds. (*See* Doc. 363 at 13.) For these reasons, especially in the absence of clear guidance from the Eleventh Circuit or persuasive authority from sister courts, the court will exercise caution and only consider behavior pursuant to the instant case.

**\*7** But, in a request that stretches the court's cautious tendency beyond its breaking point, Phil Minga also asks the court to ignore Roche's allegations pertaining to all activities prior to November 2019, when Roche filed its Second Amended Complaint. (Doc. 388 at 3.) He argues that because the court dismissed him for lack of personal jurisdiction pursuant to Roche's First Amended Complaint in September of 2019, he should not be liable for anything he did between September 2018, when Roche filed its original Complaint, and November 2019, when Roche filed its Second

Amended Complaint to properly allege personal jurisdiction over him. This argument fails for the simple reason that Phil Minga's alleged misdeeds relate to the case currently before the court. (The court also observes that Phil Minga continued filing briefs in this case even during his two-month dismissal period. *See, e.g.*, Doc. 293.) Phil Minga's intermittent non-party status does not absolve his prior bad-faith actions in this case before the court.

### *Roche's uncontroverted evidence*

After removing the ineligible allegations of conduct not in this case from consideration, the following accusations remain: doctoring and spoliating evidence; harassing a witness; violating a court order to disclose assets; filing bad-faith motions; sending false statements to a third-party financial institution to delay discovery; failing to comply with discovery requests; and misleading the court about the purpose of certain financial accounts.

The court need not proceed any further than Roche's first allegation—that "Defendants' document production contains numerous demonstrable forgeries that have never been corrected, explained, or even acknowledged." (Doc. 363 at 9.) This allegation alone, demonstrated by clear and convincing evidence, is more than enough to require case-ending sanctions. *See Qantum Communs. Corp.*, 473 F. Supp. 2d at 1269.[5] The severity of this sanction is warranted in large part because the doctored evidence cuts to the very essence of Roche's substantive claims. Roche contends that Defendants purchased Roche's international and not-for-retail (NFR) test strips from suppliers but falsely sold and adjudicated the same test strips as domestic and retail versions. The apparent veracity of Roche's claims depends in large part on evidence—in the form of invoices from suppliers—showing that Defendants bought hundreds of thousands of Roche's international and NFR test strips. Roche presented the court with overwhelming evidence that certain Defendants, in an apparent attempt to reduce both liability and possible damages, edited these invoices to falsely show that Defendants did not purchase Roche's international and NFR test strips.

To support the contention that the Mingas doctored the invoices, Roche points to the testimony of Christopher Daniel Knotts, who managed PHC's warehouse in Amory, Mississippi. Mr. Knotts testified that as a warehouse manager, he kept all physical copies of incoming test strip-supplier invoices in a box. (Doc. 284 at 83.) Within three days

after Roche filed suit, Phil Minga asked Mr. Knotts to deliver the box—containing four years' worth of invoices—to Phil Minga's boardroom located across the street from the warehouse. (*Id.*) Mr. Knotts testified that he never saw the box again. Sometime later, Mr. Knotts provided Roche access to his PHC email account, which contained electronic versions of a small percentage of the same invoices he had given Phil Minga. (*Id.* at 84.) Pursuant to the court's order on September 17, 2018 for Defendants to explain their adjudications of Roche's test strips (Doc. 22), Phil and Konie Minga gave Roche hundreds of scans—apparently derived from the box of invoices that Mr. Knotts put in the boardroom—purporting to show PHCs receipt of thousands of boxes of Roche's test strips.

**\*8** But a side-by-side comparison of the invoices from the email account and the invoices provided by the Mingas reveals obvious—and troubling—differences.

Accompanying its motion for sanctions, Roche first presents a set of two versions of invoices of Roche test strips from supplier Par Nasa to Defendant Medpoint, LLC in Amory, Mississippi. (Docs. 366-21, 366-22.) On the invoices Roche obtained through Mr. Knotts's email account, each shipment is addressed to Phil Minga. On the invoices supplied by the Mingas pursuant to the court's discovery order, blank, awkwardly situated gaps appear where Phil Minga's name apparently had been. The documents are identical in every other way, featuring the same dates, names, addresses, inventory numbers, and costs. Roche provides seven examples of this apparent digital erasure on invoices representing about $60,000 worth of inventory. (Doc. 366-22.)

Next, Roche provides what appears to be an invoice from supplier Surplus Diabetic with a reference to Defendant Medpoint Advantage, LLC deleted from the scan, as well the bottom line apparently amended to incorrectly show that Defendants still owed the full balance of the transaction. (Doc. 366-23.)

Roche further presents dozens of invoices from supplier Current Trade that feature all kinds of apparent and obvious modifications. Although both versions of each invoice appear to derive from the same original documents—because they share identically positioned features such as tracking numbers, dates, transaction numbers, and prices—the Mingas' discovery productions appear to change the "to" and "from" addresses, names of the shippers and

recipients, outstanding payment amounts, email addresses, and—perhaps most tellingly—whether the shipped inventory were international/NFR test strips or domestic/retail test strips. (Docs. 366-25–366-28.)

Defendants' response to this evidence is less than persuasive. Konie Minga and the Corporate Defendants argue as follows:

> At most, Roche has shown that there are two versions of invoices that exist. There is no evidence that the invoices differ because of intentional or bad faith conduct by any of the Defendants, and the invoices may have even been altered by someone else. Further, if any invoice is in fact shown to have been altered by any defendant, neither Roche nor Knotts claims to have personal knowledge of that Defendant's intent in doing so.

(Doc. 389 at 14.) And inexplicably, Mr. Minga offers no explanation whatsoever about the fabricated invoices. His 20-page response to the court's show-cause order fails to even mention, much less attempt to refute, Roche's allegations.

In sum, Defendants' entire response to Roche's overwhelming body of evidence demonstrating Defendants' fraud is to suggest that (a) perhaps the Mingas had wholesome motives in tediously altering hundreds of invoices before giving them to Roche, or (b) maybe some unknown person digitally manipulated the invoices in such a way that coincidentally undermines Roche's substantive claims against these Defendants.

Roche persuasively counters Defendants' lack of evidence and pair of implausible hypotheticals with the following explanation.

> **\*9** Defendants' motives were obvious: Obscuring Phillip Minga's and Medpoint Advantage's liability and erasing evidence of the extent of their fraud. Roche's allegations in this action hinge on the fact that Priority Care submitted well over 400,000

fraudulent insurance claims for retail test strips. The key documentary evidence for the fraud is that the Corporate Defendants' invoices show that they purchased from suppliers and dispensed to patients NFR test strips instead of retail test strips. By doctoring the Current Trade invoices to remove references to international and NFR test strips, Defendants sought to falsely understate the extent of their fraud and reduce the damages that Roche would be able to prove.

Doc. 363 at 19. The testimonies of Christopher Daniel Knotts, Geneva Oswalt, and Phillip Carson provide additional evidence to support Roche's motion for sanctions. The court ultimately finds that the unexplained existence of two sets of invoices conclusively establishes, by clear and convincing evidence, that Defendants engaged in sanctionable, bad-faith activity.

Furthermore, Defendants have compounded their bad-faith behavior by steadfastly refusing to correct or even acknowledge their initial fraud. Roche first raised the fake invoice issue on December 21, 2018 in its First Amended Complaint (Doc. 90 at 47). On December 27, 2018, Roche asked Defendants to produce "[a]ll documents and communications concerning [y]our alteration of invoices" (Doc. 366-29). In response, Defendants objected because the request for production was "argumentative and unproven," "disproportionate to the needs of the case," and "overly broad and unduly burdensome; [it] is not reasonably calculated to lead to the discovery of admissible evidence; and [it] seeks documents and communications that are not relevant to the claims and defenses in this case." (Doc. 366-30.) Roche raised the issue again in its notice pursuant to Federal Rule of Civil Procedure 30(b)(6). (Doc. 366-31 at 5.) But Defendants' 30(b)(6) deponent, Geneva Oswalt, deflected Roche's allegations during her deposition and stated that she "had no reason to investigate" the apparently fake invoices. (Doc. 366-1 at 14.) In the sixteen months since Roche first brought the flagrantly falsified discovery documents to Defendants' attention, Defendants have alternately misdirected, stonewalled, or obfuscated every demand to correct or explain their obvious fraud.

### Punishment and remedy

Because Roche has clearly and convincingly established that Defendants doctored hundreds of critical discovery documents, the court must next determine the appropriate sanction to reflect the relative gravity of Defendants' bad-faith behavior. See *Eagle Hosp. Physicians*, 561 F.3d at 1307 (concluding, on appeal, that the district court's sanction was "commensurate with the level of misconduct.") *See also Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1544 (11th Cir. 1993) (determining that when a party has engaged in especially egregious conduct, the court should avoid "the vain gesture of first imposing ... ineffective lesser sanctions" before terminating the case.)

The Mingas' behavior in this case is especially egregious because it directly undermines the purpose of the judicial system: to determine facts and administer justice accordingly. Any attempt to conceal or misrepresent the truth—such as perjury or the destruction or manipulation of evidence—"emasculate[s] the court's ability to ascertain the truth [and] necessarily strikes at the very foundations of the adversary system and the judicial process." *In re Sealed Case*, 754 F.2d 395, 401 (D.C. Cir. 1985).

In this case, one of the key factual propositions concerns whether Defendants purchased hundreds of thousands of Roche's NFR and international-variety diabetes test strips. Beginning in October of 2018, the parties engaged in discovery for the express purpose of determining, with as much certainty and accuracy as possible, the truth or falsity of this—and many other—factual propositions. *See Paul Rock Produced, LLC v. Evergreen Media Holdings, LLC*, No. 2:14-499, 2018 WL 1858198, *1, 2018 U.S. Dist. LEXIS 68006, at *4 (M.D. Fla. Feb. 22, 2018) ("Litigation is the search for the truth and discovery exists to uncover that truth.")

**\*10** Although the Mingas may wish, sincerely and fervently, that reality were different, the court cannot permit any party to "defile" the "very temple of justice" by creating and projecting a false reality. *Chambers*, 501 U.S. at 46, 111 S.Ct. 2123. For this reason alone, the Mingas' behavior merits the highest degree of sanction. *See, e.g.*, *Chemtall Inc.*, 992 F. Supp. at 1409.

But beyond maintaining the integrity of the judicial process, courts often invoke two other justifications for issuing case-ending sanctions: (1) punishment, *Eagle Hosp. Physicians*, 561 F.3d at 1307, and (2) deterrence, *NHL v. Metro. Hockey*

*Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). Also, as a purely practical matter, the court agrees with Roche's assessment that permitting the suit to proceed is futile when "[n]either the [c]ourt nor Roche can have any confidence that anything Defendants produce going forward is accurate and authentic, or that anything they argue has a good-faith basis." (Doc. 363 at 42.)

In this case, Defendants cite to no examples of any court that failed to issue case-ending sanctions once the court conclusively determined that a party produced doctored evidence. "When a party fabricates a document or provides false evidence relating to a key issue in a case, courts have made clear that the appropriate sanction is the ultimate sanction of dismissal." *Access Innovators, LLC v. Usha Martin, LLC*, No. 1:09-cv-2893, 2010 WL 11508119, at *3, 2010 U.S. Dist. LEXIS 152303, at *9 (N.D. Ga. Apr. 28, 2010). *See also Vargas*, 901 F. Supp. at 1581 (finding that case-ending sanctions are especially appropriate "where a party manufactures evidence which purports to corroborate its substantive claims"); *Franklin Livestock, Inc. v. Boehringer Ingelheim Vetmedica, Inc.*, 251 F. Supp. 3d 962, 970 (E.D.N.C. 2017) *aff'd*, 721 F. App'x 263, 263 (4th Cir. 2018) (entering default judgment even after a defendant, on its own, admitted that it had doctored evidence and subsequently produced the authentic evidence); *Chemtall, Inc.*, 992 F. Supp. At 1410; *McDowell*, No. 95-00609, 1996 WL 684140 at *9–10, 1996 U.S. Dist. LEXIS 19558 at *27 (M.D. Fla. Nov. 4, 1996); *Qantum*, 473 F. Supp. 2d at 1269 ("the need for sanctions is heightened when the misconduct relates to the pivotal or linchpin issue in the case," and such misconduct "militates heavily in favor of the severe sanction of default.").

Here, Defendants' doctored evidence directly relates to a linchpin issue of the case because the invoices demonstrate the essence of Roche's allegations: that Defendants purchased NFR test strips but then falsely sold and adjudicated them as retail test strips. By doctoring these invoices and then refusing to acknowledge their fraud, Defendants prejudiced Roche by forcing it to spend hundreds of hours and hundreds of thousands of dollars to seek the truth elsewhere. (Doc. 363 at 42.)

Lastly, although the authentic invoices support Roche's substantive claims—and the court previously determined that Roche demonstrated a substantial likelihood of success on the merits of at least some of its claims (Doc. 290 at 3) —the court's ruling on Roche's motion for sanctions does not reflect any further determination concerning the parties'

substantive claims or defenses. *See Malautea*, 987 F.2d at 1544 ("[T]he probable merit of a litigant's case does not preclude the imposition of a default judgment sanction against that litigant.") The instant ruling merely determines that four Defendants defrauded both Roche and the court—and that default judgment is the appropriate punishment and remedy.

**Conclusion**

**\*11**  Roche asks the court to grant default judgment against Phil and Konie Minga and all Corporate Defendants. Because Roche failed to specifically allege or provide evidence to clearly and convincingly demonstrate that all 34 of the Corporate Defendants engaged in bad-faith behavior, the court will DENY Roche's motion regarding all Corporate Defendants except Medpoint Advantage, LLC (including "Medpoint, LLC") and Priority Healthcare Corp.

Conversely, because Roche presents clear and convincing evidence that Phil Minga; Konie Minga; Priority Healthcare Corp; and Medpoint Advantage, LLC (including "Medpoint, LLC") engaged in sanctionable conduct by producing hundreds of falsified documents in discovery and then refusing to acknowledge their fraud, the court will GRANT Roche's motion to sanction these four Defendants and enter DEFAULT JUDGMENT against them.

Pursuant to Roche's request for an inquest, the court will ORDER a hearing before the court, set at 10:00 a.m. on Tuesday, June 16, 2020 in Courtroom 5A of the Hugo L. Black Federal Courthouse in Birmingham, Alabama to determine the appropriate amount of damages. *See Adolph Coors Co. v. Movement Against Racism & The Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (holding that a court may determine a plaintiff's damages following a default judgment by either "a hearing or a demonstration by detailed affidavits establishing the necessary facts.")

Roche SHALL submit evidence to the court to support the claimed amount of damages by May 26, 2020. Sanctioned Defendants SHALL submit any rebuttal evidence by June 4, 2020. The parties *may* also submit briefs by the same respective dates, if they so desire.

**DONE** and **ORDERED** this 8th day of May, 2020.

**All Citations**

Slip Copy, 2020 WL 2308319

Roche Diagnostics Corp. v. Priority Healthcare Corp., Slip Copy (2020)

Footnotes

1      The Corporate Defendants are Priority Healthcare Corporation d/b/a Priority Care; Priority Care Pharmacy, LLC; Amory
       Priority Care Pharmacy, LLC; Priority Care Pharmacy Services, LLC; Priority Care Pharmacy Solutions, LLC; Amory
       Discount Pharmacy, LLC; Priority Care Pharmacy at Cotton Gin Point, LLC; Priority Care Pharmacy 2, LLC; Jasper
       Express Care Pharmacy, LLC; Vincent Priority Care Pharmacy, LLC d/b/a The Medicine Chest; Vincent Express Care
       Pharmacy, LLC; Vickers Priority Care Pharmacy, LLC; Carbon Hill Express Care Pharmacy, LLC; Bowie's Priority Care
       Pharmacy, LLC d/b/a Bowie's Discount Pharmacy; Bowie's Express Care Pharmacy, LLC; B&K Priority Care Pharmacy,
       LLC; B&K Express Care Pharmacy, LLC; Monroe Pharmacy Corporation; Tombigbee Pharmacy, LLC; Main Street Drugs,
       LLC; Medical Park Discount Pharmacy, LLC; Burns Discount Drug Store, LLC; Burns Discount Drug Store, LLC; Ozark
       Family Pharmacy, LLC; Ozark Family Pharmacy, LLC; Medpoint Advantage, LLC; Medpoint Pharmacy Benefit Managers,
       LLC d/b/a Medpoint Pharmacy; Professional Healthcare Staffing, LLC; Razorback Pharmacy Services, Inc.; Priority
       Express Care Pharmacy, LLC; Yellowhammer Pharmacy Services Corporation; Priority Care Professional Staffing, LLC;
       Medpoint, Inc.; and Medpoint, LLC.

2      The three Asset-holding Defendants—KJM Holdings, LLC; Minga Investments, LLC; and Capital Asset Management,
       LLC—also filed three identical response briefs to the court's show-cause order. (Docs. 390–92.) The briefs state that
       because Roche's motion "references them in multiple places, the Asset Holder Entities feel the need to respond to certain
       of the allegations." (Doc. 390 at 1–2.) But because Roche does not seek sanctions against these three Defendants, the
       brief(s) say nothing about the dispositive issue, and the court did not order these Defendants to show cause pursuant to
       Roche's motion, the court will not consider the Asset-holding Defendants' response.

3      Roche excludes the following Individual Defendants from the instant motion: Wesley Minga, Christopher Knotts, Kristen
       Knotts, Daniel Baker, Heather Baker, William Austin, Sammy Phillip Carson, Kim Carson, Geneva Oswalt, Melissa
       Sheffield, and Ashley Tigrett. Roche also excludes the three Asset-holding Defendants—KJM Holdings, LLC; Minga
       Investments, LLC; and Capital Asset Management, LLC.

4      Some apparent confusion exists about the distinction, if any, between "Medpoint, LLC" and "Medpoint Advantage, LLC."
       See, e.g., Doc. 366-29 at 15. For the purposes of this memorandum opinion and accompanying order, the two are
       considered the same, such that any order directed at Medpoint Advantage, LLC applies with equal force to Medpoint,
       LLC, and vice-versa.

5      When ordering the preliminary injunction to freeze Defendants' assets and then again when denying Konie Minga's
       baseless motion to reconsider, the court pointed to substantial evidence demonstrating "Defendants' recalcitrance" and
       "pattern of chronic, deceptive conduct" before the court. (Doc. 290 at 2–7; Doc. 297 at 3.) Although delving into Roche's
       remaining sanctions allegations is practically superfluous, given the immense weight of evidence showing that Defendants
       doctored hundreds of invoices, the court observes that Defendants' digital manipulation of evidence is only one activity
       in an unfortunately lengthy line of abuses before the court.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# **Exhibit D**

2019 WL 5810312
Only the Westlaw citation is currently available.
United States District Court, N.D.
Alabama, Southern Division.

ROCHE DIAGNOSTICS CORP., et al., Plaintiffs,

v.

PRIORITY HEALTHCARE
CORP., et al., Defendants.

Case No. 2:18-CV-01479-KOB-HNJ
|
Signed 11/07/2019

**Attorneys and Law Firms**

Aron Fischer, Pro Hac Vice, Geoffrey Potter, Pro Hac Vice, Timothy Gray, Pro Hac Vice, Patterson Belknap Webb & Tyler LLP, New York, NY, David J. Canupp, James Bradley Emmons, LaNier Ford Shaver & Payne PC, Huntsville, AL, for Plaintiffs.

James P. Wilson, Jr., Mitchell McNutt & Sams PA, Columbus, MS, Albert G. Delgadillo, Pro Hac Vice, H. Richmond Culp, Pro Hac Vice, Stephen K. Otey, Pro Hac Vice, Mitchell, McNutt & Sams PA, Tupelo, MS, Amie Adelia Vague, Christine E. Gwinn-Ross, Harlan Irby Prater, IV, Jackson R. Sharman, III, Jeffrey P. Doss, Wesley B. Gilchrist, Lightfoot Franklin & White LLC, Birmingham, AL, Annie Friedman, Derrelle M. Janey, Gottlieb & Janey LLP, New York, NY, for Defendant Priority Healthcare Corporation.

Harlan Irby Prater, IV, Jackson R. Sharman, III, Jeffrey P. Doss, Wesley B. Gilchrist, Amie Adelia Vague, Christine E. Gwinn-Ross, Lightfoot Franklin & White LLC, Birmingham, AL, Annie Friedman, Derrelle M. Janey, Gottlieb & Janey LLP, New York, NY, for Defendants Priority Care Pharmacy LLC, Amory Priority Care Pharmacy LLC, Priority Care Pharmacy Services LLC, Priority Care Medical Supply LLC, Priority Care Pharmacy Solutions LLC, Amory Discount Pharmacy LLC, Priority Care Pharmacy at Cotton Gin Point LLC, Priority Care Pharmacy 2 LLC, Jasper Express Care Pharmacy LLC, Vincent Priority Care Pharmacy LLC, Vincent Express Care Pharmacy LLC, Vickers Priority Care Pharmacy LLC, Carbon Hill Express Care Pharmacy LLC, Bowies Priority Care Pharmacy LLC, Bowies Express Care Pharmacy LLC, B&K Priority Care Pharmacy LLC, B&K Express Care Pharmacy LLC, Tombigbee Pharmacy LLC, Main Street Drugs LLC, Medical Park Pharmacy Inc.,

Medical Park Discount Pharmacy LLC, Burns Drugstore Inc., Burns Discount Drug Store LLC, Ozark Family Pharmacy LLC, Medpoint Advantage LLC, Medpoint Pharmacy Benefit Managers, Konie Minga, Daniel Baker.

John W. Clark, IV, Clark Law Firm PC, Leigh Anne Hodge, Hillary Chinigo Campbell, Bradley Arant Boult Cummings LLP, Birmingham, AL, for Defendants Samuel Phillip Carson, Kimberly P. Carson.

## MEMORANDUM OPINION

KARON OWEN BOWDRE, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** This matter comes before the court on "Plaintiffs' Motion for an Order Freezing Certain Assets of Defendants." (Doc. 252.) On October 23, 2019, the court entered a temporary restraining order that froze five financial accounts associated with the Minga Defendants.[1] (Doc. 261.) Pursuant to the restraining order, the court set a hearing to consider whether to enter a preliminary injunction and maintain the freeze until the underlying case is resolved.

Plaintiffs and Defendants filed briefs with the court (Docs. 277, 276), and Plaintiffs presented evidence in advance via affidavit and during the hearing; Defendants could cross-examine any affiants they wished. For the reasons explained at the end of the hearing, as more thoroughly addressed below, the court will **GRANT** Plaintiffs' motion for a preliminary injunction to maintain the freeze on the Minga Defendants' accounts. (Doc. 252.)

**Background**
On December 21, 2018, Plaintiffs Roche Diagnostics Corporation and Roche Diabetes Care, Inc., filed an amended complaint against 40 Defendants affiliated with Priority Healthcare Corporation, alleging multiple violations under the Racketeer Influenced and Corrupt Organizations Act, as well as claims of common law and statutory fraud, conspiracy to commit fraud, negligent misrepresentation, unjust enrichment, and money had and received. (Doc. 90.)

Roche, a diabetic test strip manufacturer, alleges that Individual and Corporate Defendants operate as a cooperative enterprise to defraud medical insurance companies by billing insurance companies for Roche test strips that are either not shipped to patients at all, or are different from—and

priced much higher than—the products that patients actually receive. Roche avers that spouses Konie and Phillip Minga lead the enterprise, with Konie Minga owning the Corporate Defendants and Phillip Minga acting as the *de facto* director of the scheme. Roche specifically contends that Defendant Priority Healthcare Corporation ("PHC") owns or operates all of the other Corporate Defendants as subsidiaries for the purpose of generating, submitting, and processing fraudulent insurance claims related to Roche's test strips. Roche avers Defendants' scheme caused Roche to pay multiple millions of dollars in unwarranted rebates from which Defendants profited.

In support of its motion for a temporary restraining order and preliminary injunction, Roche submitted four affidavits and numerous pages of deposition testimony and financial documents, among other records. Roche contends that this evidence portrays that (1) Priority Care's fraud scheme is now undisputed, with Priority Care's corporate witness Geneva Oswalt and former Defendant Christopher Daniel Knotts both stating under penalty of perjury that Roche's allegations of fraud are true; (2) the proceeds of this fraud are held in identifiable investment accounts in the names of shell entities owned by Konie Minga that were created to conceal Defendants' assets; (3) Phillip and Konie Minga withdrew or transferred $15 million from their business accounts within days after Roche filed this lawsuit; and (4) Defendants doctored over one hundred business records produced in discovery in an effort to falsely understate the magnitude of their theft.

**Standard of Review**

**\*2** *Federal Rule of Civil Procedure 65* governs preliminary injunctions. Based on this rule, a preliminary injunction is appropriate if the movant can establish: 1) a substantial likelihood that it will prevail on the merits; 2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; 3) that its threatened injury outweighs the threatened harm the injunction may cause the opponent; and 4) that granting the preliminary injunction will not disserve the public interest. *W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 956 (11th Cir. 1982).

**Analysis**

Because "the standard of review for a temporary restraining order is the same as the standard of review for a preliminary injunction," *Butler v. Ala. Judicial Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1229 (M.D. Ala. 2000), the court considers

the same elements, and many of the same facts, featured in the temporary restraining order. Beyond challenging the four elements required for an injunction, Defendants also raise several other arguments against maintaining the asset freeze. The court considers the four injunction elements and each of Defendants' ancillary arguments below.

**1. Preliminary Injunction Elements**

*A. Roche has demonstrated a substantial likelihood of success on the merits.*

Through the evidence presented in its briefs and at the hearing, Roche has shown a high likelihood of success on its unjust enrichment claim against Defendants. First, Roche supported the instant motion with evidence from former Defendant and PHC employee Daniel Knotts, the estranged son-in-law of the Mingas. Mr. Knotts admitted that the Defendants falsified insurance claims based upon his review of pertinent records. Second, the declaration of forensic accountant and certified fraud examiner Kenneth Yormark demonstrates that the Mingas' accounts likely contain profits derived from Defendants' alleged fraud. Third, Geneva Oswalt's testimony as Defendants' Rule 30(b)(6) witness further corroborates Roche's claims that Defendants engaged in large-scale fraud. Taken as a whole, this evidence exhibits a substantial likelihood that the Defendants unjustly enriched themselves at Roche's expense.

*B. Roche will suffer immediate and irreparable injury without a preliminary injunction.*

Roche claims it is entitled to restitution and disgorgement based on unjust enrichment. Roche compliance analyst Kerri McAleavey testified that Roche has paid between approximately $30.7 and $32.3 million in unwarranted rebates because of Defendants' alleged fraud. Kenneth Yormark testified that the Minga Defendants have transferred, via circuitous routes, at least $32.7 million in profits from their alleged criminal enterprise to the specific, non-business accounts the court froze via the restraining order. Based on Roche's unjust enrichment claim, and the court's upholding the viability of that claim in denying the Defendants' most recent dismissal motion (Doc. 213), Roche contends that the money in the described accounts constitute unjustly gained funds that are subject to the equitable remedy of disgorgement.

But whether Roche is entitled to the disgorged funds only partially answers the question of whether unfreezing

Defendants' accounts presents "actual and imminent" harm to Roche. *See Northeast Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990).* Roche argues that the actual and imminent harm comes from Defendants' high likelihood of dissipating these funds before disgorgement is possible.

**\*3**  In response, Defendants deny the actual, imminent nature of Roche's harm by offering three arguments. Defendants first aver that Roche's delay in seeking this injunction suggests that Roche has not and will not suffer immediate, actual and irreparable harm. Because Roche filed the underlying suit thirteen months ago, Defendants question whether Roche "only became aware of Defendants' purported imminent attempts to conceal and dissipate assets after extensive discovery." (Doc. 276 at 9.) Defendants point to *Wreal, LLC v. Amazon.com, 840 F.3d 1244, 1248 (11th Cir. 2016)* for the proposition that a "delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm. A preliminary injunction requires showing imminent irreparable harm."

Second, Defendants point to the assets that remain in the now-frozen accounts to show that Defendants are unlikely to dissipate any funds. (Transcript of Hearing at 24, *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 2:18-CV-01479, Oct. 30, 2019.) Third, Defendants argue that the motion to freeze the Mingas' assets "impermissibly asks the [c]ourt to sanction Defendants' alleged past conduct" when the purpose of an injunction is to prohibit damaging future conduct. (Doc 276 at 7.) *See also Alabama v. United States Army Corps of Eng'rs, 424 F.3d 1117, 1133 (11th Cir. 2005)* ("The sole function of an action for injunction is to forestall future violations.").

On Defendant's first point—that Roche waited too long—Roche persuaded the court during the hearing that Defendants' ongoing attempts to hide the proverbial ball strongly suggest that Roche even now may not know the full extent of the Mingas' surreptitious actions. At some point, despite continually uncovering additional information, Roche decided that even though it did not yet have all the facts about the Defendants' assets, it could not wait any longer to request an injunction. Because Defendants' track record of obstructive behavior substantiates Roche's position, the court finds that Roche's delay, to the extent one exists, does not militate against the immediacy of Roche's possible harm if these funds disappear.

Defendants' second argument, which points to the funds that remain in the now-frozen accounts to suggest that the Mingas are unlikely to dissipate the money, is facially unpersuasive. In today's financial environment, a person can electronically wire funds anywhere on the planet in a matter of a few seconds and a few keystrokes; Defendants apparently would have expected Roche to both discover and halt any attempt to dissipate the assets sometime between the first and last keystroke. Furthermore, in every case where a court has frozen a party's assets, the assets necessarily existed, or else the court would have nothing to freeze.

Turning next to Defendants' third argument—about the difference between sanctioning past conduct and preventing future harm—the court notes that past behavior often provides the best indicator of future behavior. And the affidavits and testimonies of Christopher Daniel Knotts and Kenneth Yormark, as well as the deposition of Geneva Oswalt, show a pattern of chronic, deceptive conduct. Although Mr. Knotts, Mr. Yormark, and Ms. Oswalt discussed events that occurred in the past, these occurrences manifest a high likelihood that, if left unimpeded, the Minga Defendants will conceal or dissipate some or all of the money Roche seeks to recover as disgorgement.

In particular, the evidentiary record reflects that Phillip Minga transferred multiple millions of dollars within days after Roche filed its complaint. More importantly, the Mingas transferred significant amounts of money from business accounts to personal accounts held under the dominion and control of Mr. and Mrs. Minga and contemporaneously purchased several big-ticket luxury items. Roche has persuaded the court that Defendants would likely use the now-frozen accounts to pay for personal expenses and other items —or even as forfeiture funds—to the detriment of Roche's possible recovery. Accordingly, maintaining the freeze on Defendants' assets will protect Roche from immediate, irreparable injury that the court finds would be highly likely without the injunction.

### C. The threatened injury to Roche outweighs the harm to the Defendants

**\*4**  The balance of the parties' harms weighs in Roche's favor. As discussed above, the evidence presented establishes the substantial likelihood that Defendants would conceal or dissipate assets acquired through their allegedly fraudulent enterprise, prejudicing Roche's potential for the equitable relief it seeks. Defendants, by contrast, would suffer little harm from maintaining the freeze. Roche has established

the location of these assets in savings or passive investment accounts. Furthermore, Roche's motion does not seek to freeze an additional $6 million of the Mingas' assets that are separate from the disputed accounts, along with approximately $800,000 in cash; these assets will remain available for any necessary business or personal expenses. The parties have also agreed to unfreeze the TD Ameritrade account ending in -823, and Roche has posted a $100,000 bond "to pay the costs and damages sustained by any party found to have been wrongfully enjoined." *See* Fed. R. Civ. P. 65(c). Accordingly, any adverse impact of the temporary asset freeze on Defendants would be minimal. These considerations counsel in favor of a preliminary injunction.

### D. The preliminary injunction would not disserve the public interest.

Based upon the facts presented, the court is satisfied that an injunction would not harm the public interest in any way. Roche alleges that Defendants have engaged in extensive healthcare fraud, which prompts a public interest guarding Roche's ability to recover its losses. Accordingly, public policy considerations also militate toward maintaining the status quo until the case is resolved.

### 2. Additional Arguments

Beyond challenging the four preliminary injunction elements, Defendants raise several other arguments why the court should not maintain the freeze on Defendants' assets: (1) Roche seeks both equitable relief and monetary damages; (2) Roche has shown no nexus between its injury and the assets to be frozen; and (3) the frozen accounts are not parties to the underlying case. Defendants also argue that Mr. and Mrs. Minga's due process rights under the Fifth Amendment are implicated when they must choose between waiving the right to silence by testifying about the financial transfers on the one hand and the possibility of adverse inferences from silence on the other. The court addresses each of these arguments below.

### A. Seeking both equitable relief and monetary damages precludes a freeze.

Generally, a district court may not freeze a party's assets when the party moving for the restraining order or injunction only seeks monetary damages at law. *Rosen v. Cascade Int'l*, 21 F.3d 1520, 1528 (11th Cir. 1994). But the Eleventh Circuit has repeatedly held that this rule, which applies to claims for *legal* damages, gives way when *equitable* remedies come into play.

*See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 987 (11th Cir. 1995); *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005).

In this case, Roche specifically requested the equitable remedy of disgorgement in its claim of unjust enrichment in its amended complaint. (Doc. 90 at 67.) But Defendants argue that because Roche alternatively seeks money damages, then an injunction is inappropriate here. (Doc. 276 at 13.) Defendants cite *United Steelworkers of Am., AFL-CIO-CLC v. USX Corp.*, 966 F.2d 1394, 1404 (11th Cir. 1992) for the proposition that the "principal prerequisite for injunctive relief is the absence of an adequate legal remedy." Although equitable relief is improper if an appropriate legal remedy exists, the adequate remedy for unjust enrichment *is* disgorgement, which is an equitable construction. *See SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017) ("Disgorgement is an equitable remedy intended to prevent unjust enrichment.").

The Eleventh Circuit has squarely examined Defendants' essential argument and held that freezing a defendant's assets for disgorgement is proper even when a moving party seeks both legal and equitable remedies. "We acknowledge that [plaintiff] also seeks the legal remedy of civil damages," the Eleventh Circuit noted, "[b]ut, the asset freeze is justified as a means of preserving funds for the equitable remedy of disgorgement. We do not believe that the inclusion of a claim for civil penalty damages makes the remedies sought wholly legal and not equitable." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005).

**\*5** In this case, Roche's pursuit of both legal and equitable remedies does not mean an asset freeze is inappropriate.

### B. The moving party must show a nexus between its injury and the assets to be frozen.

Defendants argue that freezing assets is improper if the moving party cannot "draw[ ] a sufficient factual connection between the accounts and the underlying alleged fraud." (Doc. 276 at 6.) Defendants point to an Eleventh Circuit opinion that held that even if the plaintiff's claim could result in an equitable remedy, the plaintiff's "identification of a specific amount of money to which it claims entitlement does not relieve it of the obligation to show the existence of specific funds subject to an injunction." *Noventa Ocho Ltd. Liab. Co. v. PBD Props. Ltd. Liab. Co.*, 284 F. App'x 726, 728 (11th Cir. 2008). The fact that Defendants pulled this quote from an unpublished opinion that applied Florida

law and dealt with a non-equitable remedy undermines its applicability to this case.

The other opinions to which Defendants point are similarly distinguishable from the instant case. For example, Defendants cite *Mitsubishi Int'l Corp. v. Cardinal Textile Sales*, 14 F.3d 1507, 1521 (11th Cir. 1994), which held that "Ordinarily, the general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment." But *Mitsubishi* is inapposite because the plaintiffs in that case sought a writ of attachment based on a breach of a promise, not, as here, a preliminary injunction pursuant to an unjust enrichment claim. *Id.* Also, Roche sufficiently demonstrates the relationship between the frozen assets and the expansive fraudulent scheme described in the amended complaint, as substantiated by Mr. Yormark's testimony.

The court finds sufficient legal authority to freeze the assets sought here because of the magnitude of the alleged fraud and the Minga Defendants' efforts to hide both their actions and their assets. When a defendant's allegedly surreptitious behavior makes tracing funds difficult, "it is appropriate to freeze those assets where there is a just and reasonable inference they may be linked to the underlying activity." *SEC v. Asset Recovery & Mgmt. Tr., S.A.*, 340 F. Supp. 2d 1305, 1308 (M.D. Ala. 2004). Furthermore, when a moving party seeks disgorgement, it only needs to show "a reasonable approximation of a defendant's ill-gotten gains.... Exactitude is not a requirement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005). "So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).

In this case, Roche seeks between $30.7 and $32.2 million in disgorgement. Although the parties' counsel during the hearing could not establish exactly how much money is in the frozen accounts, Roche, through the forensic analysis of Mr. Yormark, reasonably asserts that the funds in the frozen accounts are linked to the Mingas' allegedly unjust enterprise. Roche has therefore satisfied its burden of linking the Mingas' behavior to the money in the Mingas' accounts.

### C. Non-party accounts may not be frozen.

**\*6** Defendants argue that because the four financial accounts at issue are owned by three LLCs, and these three LLCs

are not parties to the suit, the court may not maintain the freeze on the accounts. (Doc. 276 at 14.) Although in general, "a court may not enter an injunction against a person who has not been made a party to the case before it," *E.A. Renfroe & Co. v. Moran*, 338 F. App'x 836, 838–39 (11th Cir. 2009), both common law tradition and Federal Rule of Civil Procedure 65 permit injunctions over non-parties that are in privity with parties to the case. Rule 65 states, in relevant part, that "persons who are in active concert or participation with" a party to a case are subject to injunction. The U.S. Supreme Court explained that this rule "is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in privity with them, represented by them or subject to their control." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13–14 (1945).

The Eleventh Circuit has held that "both Rule 65 and the common-law doctrine contemplate two categories of nonparties potentially bound by an injunction.... The second category, captured under the general rubric of privity, includes nonparty successors in interest and nonparties otherwise legally identified with the enjoined party." *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017) (internal citations omitted). Privity, in turn, contemplates traditional notions of due process and fairness and "represents a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to bind the nonparty to the injunction." *Id. See also Southwest Airlines Co. v. Tex. Int'l Airlines, Inc.*, 546 F.2d 84, 95 n.38 (5th Cir. 1977) (defining a non-party in privity as "a person so identified in interest with a party ... that he represents precisely the same right in respect to the subject matter involved.")

In this case, the shared interests among the Mingas and the three LLCs are virtually identical. Mr. and Mrs. Minga are members of each of the LLCs, and Roche has provided significant evidence to demonstrate that the accounts at issue are "subject to their control." *See Regal Knitwear Co.*, 324 U.S. at 14; *see also* Doc. 252, Ex. 1–42.

The only other consideration regarding non-party injunctions concerns notice. Even non-parties who are in privity with a named party may not be enjoined unless they receive notice of the impending injunction. *ADT LLC*, 853 F.3d at 1355. But as parties to this suit and registered agents and members of the LLCs in question, Mr. and Mrs. Minga have certainly received sufficient notice in this case. *See, e.g.*, Doc. 252-20

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    5

(showing that Mr. and Mrs. Minga are the sole members of Minga Investments, LLC, and Mr. Minga is the registered agent.)

For these reasons, the court's authority to enjoin the Defendants in this case extends to the accounts that are subject to Defendants' control.

*D. Mr. and Mrs. Mingas' decision to not testify creates Fifth Amendment concerns.*
In their brief opposing the asset freeze, Defendants appear to raise two Fifth Amendment arguments. First, Defendants argue that "tension" exists "between the preliminary injunction proceeding and the temporary stay" that implicates the Fifth Amendment. (Doc. 276 at 17.) Second, Defendants' counsel contended that they wanted to put Mr. and Mrs. Minga on the stand to testify at the hearing regarding the frozen accounts, but considering the ongoing criminal case and because the Mingas would have invoked their Fifth Amendment right to silence at the hearing, Defendants had "one hand tied behind their backs." (*Id.*)

On the first point, because Judge Johnson stayed discovery pertaining to Mrs. Minga and Daniel Baker pending the resolution of the criminal matter, any tensions related to a temporary stay are now relieved. (Doc. 281 at 23.) Regarding Defendants' second point, a party's Fifth Amendment rights remain intact unless he must choose between testifying or an adverse, "automatic entry of summary judgment." *United States v. Premises Located at Route 13*, 946 F.2d 749, 756 (11th Cir. 1991). Because neither party has filed a motion for summary judgment in this case, issues related to testimony and potential adverse inference remain matters of discretion for the court.

**\*7** The Fifth Amendment "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Id.* (internal quotation marks omitted). Even so, considering the wealth of information the court received both before and during the hearing, the court had no need to draw any adverse inferences from the Mingas' absence at the hearing.

For these reasons, the court finds that Defendants' Fifth Amendment rights were not infringed.

**Conclusion**
Considering the risk of immediate harm to Roche, the court concludes that a preliminary injunction is warranted to preserve the status quo until the court, or the parties, resolve the underlying suit. The court finds that good cause exists to grant the requested preliminary injunction to order the assets subject to this order held in constructive trust to ensure the availability of the relief that Plaintiffs seek in this action, including the equitable remedies of disgorgement and restitution.

Based upon the foregoing analysis, the court **GRANTS** Roche's motion to impose a preliminary injunction (Doc. 252).

**DONE** and **ORDERED** this 7th day of November, 2019.

**All Citations**

Slip Copy, 2019 WL 5810312

Footnotes
1   Plaintiffs' amended complaint (Doc. 90) brought claims against eleven individual Defendants and 29 corporate Defendants. The motion sought (Doc. 252) and the temporary restraining order froze (Doc. 261) only five accounts associated with two of the individual Defendants: spouses Phillip and Konie Minga.

End of Document                                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit E

Case 2:18-cv-01479-KOB-HNJ   Document 291   Filed 11/07/19   Page 1 of 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| ROCHE DIAGNOSTICS CORP., et al., )<br>)<br>    **Plaintiffs,** )<br>)<br>    **v.** )<br>)<br>**PRIORITY HEALTHCARE CORP.,** )<br>**et al.,** )<br>)<br>    **Defendants.** ) | **Case No. 2:18-CV-01479-KOB-HNJ** |

## ORDER GRANTING PRELIMINARY INJUNCTIVE RELIEF

This matter comes before the court on "Plaintiffs' Motion for an Order Freezing Certain Assets of Defendants." (Doc. 252.) On October 23, 2019, the court entered a temporary restraining order that froze five financial accounts associated with the Minga Defendants.[1] (Doc. 261.) Pursuant to the restraining order, the court set a hearing to consider whether to enter a preliminary injunction and maintain the freeze until the underlying case is resolved.

Plaintiffs and Defendants filed briefs with the court (Docs. 277, 276), and Plaintiffs presented evidence in advance via affidavit and during the hearing; Defendants could cross-examine any affiants they wished. For the reasons explained at the end of the hearing and in the accompanying memorandum opinion, the court **GRANTS** Plaintiffs' motion for a preliminary injunction to maintain the freeze on the Minga Defendants' accounts and **ORDERS** as follows:

    A.  Defendants Priority Healthcare Corporation; Priority Care Pharmacy LLC; Amory

---

[1] Plaintiffs' amended complaint (Doc. 90) brought claims against eleven individual Defendants and 29 corporate Defendants. The motion sought (Doc. 252) and the temporary restraining order froze (Doc. 261) only five accounts associated with two of the individual Defendants: spouses Phillip and Konie Minga.

Priority Care Pharmacy LLC; Priority Care Pharmacy Services LLC; Priority Express

Care Pharmacy LLC; Priority Care Pharmacy Solutions LLC; Amory Discount Pharmacy

LLC; Priority Care Pharmacy at Cotton Gin Point LLC; Priority Care Pharmacy 2 LLC;

Jasper Express Care Pharmacy LLC; Vincent Priority Care Pharmacy LLC; Vincent

Express Care Pharmacy LLC; Vickers Priority Care Pharmacy LLC; Carbon Hill Express

Care Pharmacy LLC; Bowie's Priority Care Pharmacy LLC; Bowie's Express Care

Pharmacy LLC; B&K Priority Care Pharmacy LLC; B&K Express Care Pharmacy LLC;

Tombigbee Pharmacy LLC; Main Street Drugs LLC; Yellowhammer Pharmacy Services

Corporation; Medical Park Discount Pharmacy LLC; Burns Discount Drug Store LLC;

Ozark Family Pharmacy LLC; Priority Care Professional Staffing LLC; Medpoint Inc.;

Medpoint LLC; Medpoint Advantage LLC; Professional Healthcare Staffing LLC; and

Defendant Konie Minga, and her relatives, officers, agents, servants, employees, and

attorneys, and all other persons in active concert or participation with her, whether acting

directly or through any trust, corporation, subsidiary, or other device, including the

entities KJM Holdings, LLC; Capital Asset Management, LLC; and Minga Investments,

LLC, are hereby:

1. **ENJOINED AND PROHIBITED** from transferring, liquidating, encumbering,

   pledging, loaning, concealing, dissipating, disbursing, assigning, spending,

   withdrawing, or otherwise disposing of any funds, shares of stock, or other assets

   held in SunTrust Bank account numbers ending in -952 and -628 in the name of

   "KJM Holdings, LLC"; TD Ameritrade account number ending in -902 in the

   name of "Capital Asset Management LLC"; and E*Trade Securities account

   number ending in -911 in the name of "Minga Investments LLC" (the

"Accounts"), except as described below;

2. **ORDERED** to return to the Accounts, within two business days of this order, any funds or assets disbursed or transferred after December 31, 2018 from those accounts, by check, wire, cash withdrawal, or other form of direct or indirect transfer; and are

3. **ORDERED** to furnish by electronic mail to Plaintiffs' counsel Geoffrey Potter (gpotter@pbwt.com), within 48 hours of the return of those assets to the Accounts, verified documents and statements showing the return of those assets, and the current balance of the Accounts.

B. SunTrust Banks, Inc., within 48 hours of the receipt of this order, **SHALL PRODUCE** to Plaintiffs all documents demanded by the subpoena dated October 24, 2019, issued pursuant to the court's temporary restraining order that have not yet been produced by SunTrust Banks.

C. SunTrust Banks, Inc., TD Ameritrade, Inc., and E*Trade Securities LLC, within three business days of receipt of this Order, **SHALL LIQUIDATE** all assets in the Accounts and deposit all resulting funds into the Registry Fund of the Treasury by check(s) made payable to "Clerk, U.S. District Court." The check(s) will state the caption and docket number of this case ("Roche v. Priority Healthcare Corp., 18-cv-1479") and be sent by FedEx Priority Overnight to "Sharon Harris, Clerk of Court, Hugo L. Black United States Courthouse, 1729 5th Avenue North, Birmingham, Alabama 35203." The Clerk of Court will notify the court upon receiving and depositing these checks.

Immediately upon conveyance of such funds to the Clerk of Court, SunTrust Bank, TD Ameritrade, and E*Trade Securities LLC **SHALL SEND** a digital scan of the

check(s) by electronic mail to Geoffrey Potter (gpotter@pbwt.com), counsel for

Plaintiffs, and Derrelle Janey (djaney@gottliebjaney.com), counsel for Defendants; and

will send a copy of the check(s) to: "The Honorable Karon O. Bowdre, Hugo L. Black

United States Courthouse, 1729 5th Avenue North, Birmingham, Alabama 35203."

   If any funds are subsequently transferred to or deposited into the Accounts,

SunTrust Banks, Inc., TD Ameritrade, Inc., and E*Trade Securities LLC, following the

procedures described above, **SHALL CONVEY** such funds to the Clerk of Court within

three business days of those transfers or deposits, and shall immediately provide copies of

the check(s) to the Court and counsel.

D. The Clerk of the Court is directed to receive and deposit all funds received under this

  order into the Registry Fund of the Treasury and place them in an interest-bearing

  account, whereupon the funds will be enjoined and held in constructive trust under the

  custody and administration of the court to secure and preserve the availability of the relief

  Plaintiffs seek (including the equitable remedies of disgorgement and restitution) until the

  final disposition of this action.

   This order will remain in effect until further order of this court directing disbursement of

the funds deposited into the Registry Fund of the Treasury.

   **DONE** and **ORDERED** this 7th day of November, 2019.

_Karon O. Bowdre_

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE

# Exhibit F

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISRICT OF MISSISSIPPI**

In re:                                        )                    Case No. 20-11968-SDM
                                              )
Minga Investments, LLC,                       )                    Chapter: 11
                                              )
                Debtors.                      )                    Judge: Hon. Selene D. Maddox
_____ )

**ORDER MODIFYING AUTOMATIC STAY**
**PURSUANT TO SECTION 362(d)(1) OF THE BANKRUPTCY CODE**

This matter came before the Court on the motion (the "Motion")[1] of Roche Diagnostics

Corp. and Roche Diabetes Care, Inc. (collectively, "Roche"), for entry of an order pursuant to

Section 362(d)(1) of Title 11 of the United States Code ("Bankruptcy Code"), modifying the

automatic stay to permit Roche to continue a civil action (the "Alabama Action") by Roche

pending against the Debtors in the United States District Court for the Northern District of

Alabama ("District Court"); and due and proper notice of the Motion having been given; and

after due deliberation and it appearing that sufficient cause exists for granting the requested relief

and that the relief requested in the Motion is in the best interests of the Debtors' estates and

creditors,

        IT IS HEREBY ORDERED THAT:

---

[1] Capitalized terms used in this Order that are not defined have the meanings given to them in the Motion.

1.      The Motion is GRANTED.

2.      The automatic stay set forth in 11 U.S.C. § 362(a), as applicable to the above-referenced Debtor, is hereby modified to permit Roche to continue the Alabama Action against the Defaulted Debtors and all of the other Debtors.

3.      Any order, judgment, findings of fact or conclusions of law of the Alabama Court with respect to a Debtor shall be binding on such Debtor and shall be conclusive for all purposes in this case, including but not necessarily limited to establishing: (a) the quantum of a Debtor's liability to Roche, and (b) that such Debtor's actions were fraudulent, willful or malicious.

4.      Nothing in this Order alters or limits the scope of any injunctive relief that has been granted or may be granted by the District Court, but, for the avoidance of doubt, the automatic stay set forth in 11 U.S.C. § 362(a), as applicable to the above-referenced Debtor, is hereby modified to permit Roche to seek entry of any and all injunctive relief in the Alabama Action.

5.      Notwithstanding anything contained herein to the contrary, nothing contained in this Order permits or shall be construed to authorize Roche or any other party to take any action to enforce any judgment of the District Court against any property that is property of a Debtor's estate pursuant to 11 U.S.C. § 541.

6.      The relief set forth herein is without prejudice to the right of Roche to seek a further modification of the automatic stay or any other appropriate relief from this Court.

7.      The Court shall retain jurisdiction to hear and determine all matters arising from implementation of this Order.

### ###END OF ORDER###

53347244.v1